In re the Marriage of Jackie Lynn JORSCHUMB, Petitioner, Respondent,

v.

Allen Dale JORSCHUMB, Appellant.

No. C5-85-2328.

Court of Appeals of Minnesota.

July 15, 1986.

Review Denied Aug. 27, 1986.

Jeanne L. Bringgold, Wheaton, for respondent.

Ronald R. Frauenshuh, Jr., Ortonville, for appellant.

Heard, considered and decided by WOZNIAK, P.J., and FOLEY and LANSING, JJ.

## OPINION

FOLEY, Judge.

Allen D. Jorschumb appeals from a December 9, 1985 judgment awarding respondent Jackie L. Jorschumb permanent custody of the couple's only child and from the denial of his motion for a new trial. He contends on appeal that the custody award constitutes an abuse of discretion under *Pikula v. Pikula*, 374 N.W.2d 705 (Minn. 1985), and that respondent's failure to comply with a discovery request for psychological results rendered the testing psychologist's trial testimony inadmissible. We affirm.

## FACTS

This case arises out of the parties five-year marriage and centers on the custody of their son, J.A., who was four years old at the time of trial. For the duration of the marriage, the couple lived on a farm with respondent's 12-year-old son from a former marriage. On August 10, 1984, a hearing for temporary relief was held.

Both parties testified at the temporary hearing that they were better suited to provide for J.A.'s daily needs and functioned as the child's primary caretaker. Respondent's parents stated that both parties were loving parents but believed that appellant would provide a more stable environment for J.A. The trial court awarded the couple joint temporary custody with each receiving custody 3½ days per week. The court further ordered preparation of a child custody study in the event review of the custody situation was necessary.

A final custody hearing took place on September 26, 1985. During this intervening period, both parties received family counseling from Dr. John Husted, a licensed psychologist. After 15–20 sessions, appellant ceased contact with Dr. Husted. Respondent remained in Dr. Husted's care at the time of trial. A custody report prepared by the court-appointed social worker, Beth Palm, was filed on January 2, 1985. Palm was unable to make a specific custody recommendation without the benefit of psychological reports which both parties withheld. Palm did note however, that based on the information provided by the parties, appellant would likely provide the most stable home environment.

Dr. Husted performed MMPI tests on both parties. During discovery, appellant sought access to respondent's medical records, including the MMPI results. The request was denied on the grounds that part of the material was privileged. Appellant's motion to compel discovery was deferred for consideration by the trial judge assigned to the case. Appellant did not renew his motion.

At the final custody hearing on September 26, 1985, respondent testified that she was regularly left alone with the children while appellant attended to farming duties and that she assumed responsibility for bathing, toilet-training, feeding and playing with J.A. She further claimed that her

attempts to discipline J.A. were often undermined by appellant.

Appellant claimed that he was primarily responsible for grooming, disciplining and toilet-training J.A., and that respondent often acted irresponsibly by refusing to get out of bed when J.A. awoke in the morning and by frequently leaving him in the care of grandparents or his 12–year-old stepbrother. He also testified that respondent's inability to control her temper and her need to seek psychological counseling provided an unstable environment for J.A.

Dr. Husted testified for respondent based on 40–50 counseling sessions with her individually and six with the children present. Both children were observed to exhibit a warm, open relationship with respondent and with each other. In Dr. Husted's opinion, respondent satisfied the emotional needs of her children and had an excellent prognosis for meeting these needs in the future. When asked about respondent's MMPI results, Dr. Husted responded, without objection, that respondent was in excellent mental health and had made great strides in becoming emotionally self-sufficient. Both parties' MMPI results were admitted into evidence without objection. Dr. Husted ultimately concluded:

I think at this point that the boy's best interests would be to stay—to have the primary relationship being with his mother at this time. It seems to me that she has shown sufficient stability and sufficient capacity to nurture that, at least for the foreseeable future this would probably be the most effective relationship for him and for her.

Margaret Ostergaard, an intern therapist, testified for appellant. Her testimony was based in part on the results of a neighborhood survey from a list of names provided by appellant. Some of those who responded testified at trial. In general, they agreed that J.A. had a "special relationship" with appellant, a point respondent agreed was accurate. According to Ostergaard, the survey indicated that the older child was often observed babysitting for J.A. for long periods of time. Ostergaard

further stated that her interviews with appellant strongly indicated his desire and ability to meet J.A.'s daily needs. Ostergaard concluded:

I need the court to understand that I have not interviewed Mrs. Jorschumb, that my evidence would be on the survey and reading of the transcripts, and I undoubtedly would state that Mr. Jorschumb would be the more fit parent * *.

In awarding permanent custody of [J.A.] to respondent, the court found:

7. Split custody has been tried for the past year, but because of the parents' inability to relate in an amicable manner, this is no longer a feasible alternative.

8. The evidence is mixed as to whether Mr. Jorschumb or Mrs. Jorschumb has been the child's primary caretaker, but taking all evidence together, including the expert testimony of Dr. John Husted, a licensed consulting psychologist who has counselled both parties, the greater weight of credible evidence favors a finding that *Mrs. Jorschumb has demonstrated the normal indicia of primary parenthood and that the best interest of [J.A.] would indicate that sole custody should be granted to her for the foreseeable future.* (Emphasis supplied.)

In response to appellant's post-trial motion for reconsideration under *Pikula v. Pikula,* 374 N.W.2d 705 (Minn.1985), the trial court amplified its earlier findings to reflect that a "unique co-parenting" arrangement existed at the time of the temporary hearing and that neither party functioned solely as primary parent. This appeal followed.

### ISSUES

1. Did the trial court properly exercise its discretion when it awarded respondent permanent custody of the couples' only child?

2. Did the trial court err in allowing a psychologist's testimony when it was based in part on an undisclosed psychological test performed on respondent?

## ANALYSIS

Appellate review of a custody award is limited to whether the trial court abused its discretion by making findings unsupported by the evidence or by improperly applying the law. *Pikula v. Pikula,* 374 N.W.2d 705, 710 (Minn.1985); *Ozenna v. Parmelee,* 377 N.W.2d 483, 488 (Minn.Ct.App.1985). A trial court's findings will be upheld unless clearly erroneous. Minn.R.Civ.P. 52.-01.

### The Primary Parent Doctrine

The principle underlying all child custody determinations is the best interests of the child. Minn.Stat. § 518.17, subd. 3 (1984). Relevant factors to be considered by a trial court in assessing the "best interests of a child" are set out in Minn.Stat. § 518.17, subd. 1 (1984).[1]

In *Pikula,* the supreme court held that consideration of the "best interest" factors in Minn.Stat. § 518.17, subd. 1, requires:

[W]hen both parents seek custody of a child too young to express a preference for a particular parent and one parent has been the primary caretaker, custody be awarded to the primary parent absent a showing that that parent is unfit to be the custodian.

*Pikula,* 374 N.W.2d at 713.[2]

The *Pikula* court ultimately remanded the matter for a determination "of which, *if either,* parent was the primary caretaker of the children *at the time the dissolution proceeding was commenced."* [3] *Id.* at 714 (emphasis supplied). Here, the trial court expressly found that neither party functioned solely as the child's primary caretaker at the time of separation:

2. Evidence presented at the initial hearing revealed that each parent had a loving, close relationship with [J.A.] (then three years old). There was evidence that [respondent] disciplined [J.A.], bought food and clothes for him, took him to physicians for medical care, took him on outings, and spent about 12 hours a day with him daily. There was also evidence that [appellant] spent 2 to 3

---

1. Minn.Stat. § 518.17, subd. 1 (1984) provides: "The best interests of the child" means all relevant factors to be considered and evaluated by the court including:
 (a) The wishes of the child's parent or parents as to his custody;
 (b) The reasonable preference of the child, if the court deems the child to be of sufficient age to express preference;
 (c) The interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests;
 (d) The child's adjustment to his home, school and community;
 (e) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
 (f) The permanence, as a family unit, of the existing or proposed custodial home;
 (g) The mental and physical health of all individuals involved;
 (h) The capacity and disposition of the parties to give the child love, affection, and guidance, and to continue educating and raising the child in his culture and religion or creed, if any; and
 (i) The child's cultural background.

2. To aid trial courts in determining which parent, if either, has taken primary responsibility for the child's nurturing and care, the court adopted the indicia of parenthood set forth in

*Garska v. McCoy,* 278 S.E.2d 357 (W.Va.1981). Important factors include, *inter alia:*
 (1) preparing and planning of meals; (2) bathing, grooming and dressing; (3) purchasing, cleaning, and care of clothes; (4) medical care, including nursing and trips to physicians; (5) arranging for social interaction among peers after school, i.e. transporting to friends' houses or, for example, to girl or boy scout meetings; (6) arranging alternative care, i.e. babysitting, day-care, etc.; (7) putting child to bed at night, attending to child in the middle of the night, waking child in the morning; (8) disciplining, i.e. teaching general manners and toilet training; (9) educating, i.e. religious, cultural, social, etc.; and, (10) teaching elementary skills, i.e., reading, writing and arithmetic.

*Pikula v. Pikula,* 374 N.W.2d 705, 713–14 (Minn. 1985) (quoting *Garska,* 278 S.E.2d at 363).

3. Expounding on the phrase "at the time the dissolution proceeding was commenced," the *Pikula* court stated:
 [This phrase] is used to indicate the point in time at which the family relationships were physically disrupted by events leading to the dissolution of the marriage, e.g., *at the time of the parties' separation or the interruption of the functioning full family unit.*

*Pikula,* 374 N.W.2d at 714, n. 3 (emphasis supplied).

hours a day with him, played with him, etc. The *evidence demonstrated that neither parent could clearly be called the primary parent, but that both functioned in that capacity.* (Emphasis supplied.)

Appellant contends and the dissent agrees that the evidence overwhelmingly supports that he alone functioned as the child's primary caretaker at the time of separation and that this point was conceded by Dr. Husted on cross-examination:

Q: Dr. Husted, *if* evidence was introduced demonstrating that Mr. Jorschumb fed the children on a regular basis before the separation, * * * that he was the primary keeper of the children, he would wake them, he would change the diapers, he would feed them, and he would put them to sleep and take care of them, * * * would you frame a different—form a different opinion?

A: No, that would be consistent with my perception of the marriage and family as I first knew them. (Emphasis supplied.)

■ We do not interpret Dr. Husted's response as his opinion that appellant was the primary parent in the child's life at the time of separation. The question was phrased hypothetically and did nothing more than frame the central issues. The evidence at trial established that the parties often performed different nurturing functions. Simply because appellant ordinarily assumed primary responsibility for the child's toilet training, bedtime preparation and discipline, does not imply that he alone functioned as the primary parent. The indicia of parenthood factors adopted in *Pikula* are not prioritized and are not exclusive. *See Pikula,* 374 N.W.2d at 713.

■ The dissent focuses much of its attention on the testimony of respondent's parents in arriving at its conclusion that appellant was the primary parent at the time dissolution proceedings were commenced. While damaging to respondent's custody claim, the Hasbargens' testimony was undeniably an issue of credibility for the trial court. *See* Minn.R.Civ.P. 52.01. At the temporary hearing, Chester Hasbargen did state that Allen *would be* the better parent. When asked to explain why this was so, Mr. Hasbargen stated:

Well, on a farm is a better place to bring up and raise a child—children. They have more, ah, place to play with their stuff, and if [Jackie] is going to be in an apartment, and she has—I hear that she has an upstairs apartment, well there's no place—the children will have to be mostly in the house all the time, and if there out, then they'll be on the streets.

Chester Hasbargen has been a farmer all his adult life. While it is easy to understand why he believes the environment is advantageous to raising children, his testimony also reflects a personal bias. *Kennedy v. Kennedy,* 376 N.W.2d 702 (Minn.Ct. App.1985), cautions that an award of property should not be determinative of custody. The same basic principles apply here.

■ Lois Hasbargen's testimony was based on her admission that she observed Jackie, Allen and the child together 1–2 times per month plus holidays.

Q. Now, just a minute. I'm just asking in what situations do you see them?

A. Well, mostly on—

Q. You told me—

A. Well, I have driven out there.

Q. But how often in a month? A normal month?

A. Oh, ah, once or twice. I don't go out there very often.

It is also apparent from the record that the relationship between Jackie and her mother was often marked with tension. The trial court could properly account for all these factors in reaching its decision.

When viewed as a whole, the parents' testimony merely reinforces the trial court's finding that the parties assumed different parental functions. The dissent also places heavy emphasis on a portion of Lois Hasbargen's testimony at the temporary custody hearing reflecting her daughter's instability and immaturity. However, there is nothing in the record to suggest

that this in any way detrimentally affected the relationship between mother and child.

The dissent also asserts throughout its discussion that the trial court failed to focus on the proper period of time in making the primary parent determination. This is plainly resolved in the trial court's post-trial memorandum:

> [T]here is no need for a new trial to determine who was the primary caretaker *at the time of the initial proceeding* because the facts in this case showed that there was a unique co-parenting situation *at that time.* (Emphasis supplied.)

The close relationship between father and son is to be applauded but it should not be emphasized to the total exclusion of the nuturing activities and love provided by respondent. If the trial court had determined that respondent functioned as the primary parent under the facts, it would be evident that the law under *Pikula* was misapplied. A similar result would hold true if appellant was declared the sole primary parent.

■ The trial court was in a better position to assess the credibility of the witnesses and this court will not substitute its judgment. *See* Minn.R.Civ.P. 52.01. Its finding that neither party functioned exclusively as the primary parent at the time of the temporary hearing is not clearly erroneous. *Id.*[4] *See Pekarek v. Pekarek*, 384 N.W.2d 493 (Minn.Ct.App.1986); *Sydnes v. Sydnes*, 388 N.W.2d 3 (Minn.Ct.App.1986).

Since neither party functioned solely as primary parent at the time of separation, the trial court was obliged to consider "other indicia of parental fitness" in reaching its custody decision. As stated in *Pikula:*

> When the facts demonstrate that responsibility for and performance of child care was shared by both parents in an entirely equal way, *then no preference*

*arises and the court must limit its inquiry to other indicia of parental fitness.*

*Pikula,* 374 N.W.2d at 713–14 (emphasis supplied).

### "Best Interest" Factors

■ In custody matters, it is well established that a trial court must make written findings that reflect proper consideration of the factors set forth in Minn.Stat. § 518.17, subd. 1. *Rosenfeld v. Rosenfeld,* 311 Minn. 76, 82, 249 N.W.2d 168, 171 (1976). The trial court's findings reflect proper consideration of the statutory criteria:

> 4. J.A. and [his step-brother] have a close sibling relationship * * *. [See Minn.Stat. § 518.17, subd. 1(c) and (e)].
>
> 5. Both Mr. Jorschumb, a full-time farmer, and Mrs. Jorschumb, a part-time waitress, are fit parents and are now in good mental and physical health. [*See* Minn.Stat. § 518.17, subd. 1(g) and (h)].
>
> 6. [J.A.] has developed a close, warm, open, physical, and loving relationship with each parent. [*See* Minn.Stat. § 518.17, subd. 1(c), (e) and (h)].

Judgment, October 3, 1985.

> 7. The evidence presented at the [final custody hearing] hearing including expert testimony of psychologists, demonstrated to the Court's satisfaction that the *mother had become the primary caretaker* of [J.A.], and there were also relevant factors justifying placement with the mother including the close filial relationship [J.A.] had established with his older half-brother who resided with the mother. [*See* Minn.Stat. § 518.17, subd. 1(c), (d), (e), (f) and (h)]. (Emphasis supplied.)

Trial Court Memorandum, November 26, 1985.

---

4. The mailed "survey" approach utilized by appellant and partially relied upon by Ostergaard as a basis for her opinion does not find favor with this court. Significantly, many of those responding to the questionnaire had ties with appellant's family. None of those who respond-
ed to the survey had observed respondent and the child together on an ongoing basis. The prejudicial impact and unreliability inherent in such a device is obvious and its future use is discouraged.

A trial court is not required to address every "best interest" factor, rather, "[i]t is sufficient if the findings as a whole reflect that the trial court has taken the statutory factors into consideration, in so far as they are relevant, in reaching its decision." *Rosenfeld*, 311 Minn. at 83, 249 N.W.2d at 171–72.

Although the findings sufficiently incorporate the criteria in Minn.Stat. § 518.17, we must further determine whether the trial court abused its discretion in making findings unsupported by the evidence and ultimately in awarding custody to the mother.

■ The evidence demonstrated that both parties have a positive influence on the child and are able to provide a stable and loving environment. The child is emotionally well-adjusted, has a particularly close relationship with his step-brother and frequently verbalizes his love for respondent. It was also clearly established, however, that the child has an especially strong bond with his father and that he enjoys spending time on the family farm.

Custody decisions are generally one of the most difficult decisions a trial court must make. While we might have acted differently in this case, we cannot say that the trial court abused its broad discretion in light of the record as a whole. Nothing prevents appellant from seeking a modification in custody under Minn.Stat. § 518.18 should a change in circumstances occur.

■ We do not approve, however, of the trial court's temporary award of split custody in order to determine which party would "grow into the role of primary caretaker." This is inappropriate under *Pikula* and can only serve to increase competition between parents at their children's expense.

■ 2. Appellant additionally contends that Dr. Husted's testimony was improperly considered since it was based in part on an MMPI test of respondent's that she refused to disclose during discovery. This argument fails on numerous grounds. First, appellant failed to make a timely motion to compel discovery. Although a motion to compel was made on August 13, 1985, the court deferred the matter to the trial judge who would hear the case. Appellant failed to make a subsequent motion. Second, appellant failed to object when Dr. Husted was asked about the MMPI at trial. Third, appellant, not respondent, introduced the MMPI tests into evidence without objection. Fourth, appellant's own witness, Marie Ostergaard, testified that although she had not interviewed respondent, she had read the MMPI report and "it had a bearing" on her opinion that appellant should receive custody. Even if the MMPI should not have been considered, it does not follow that Dr. Husted's testimony was inadmissible in its entirety.

## DECISION

The trial court did not abuse its discretion in awarding custody of the child to respondent.

Affirmed.

WOZNIAK, Judge (dissenting).

I respectfully dissent. I would reverse the trial court's placement of child custody with respondent.

The majority dutifully recites the supreme court's pronouncement in *Pikula v. Pikula*, 374 N.W.2d 705, 712 (Minn.1985), that, when both parents seek custody of a child too young to express a preference for a particular parent and one parent has been the primary caretaker of the child, custody should be awarded to the primary parent absent a showing that the parent is unfit to be the custodian. The majority also notes that in this case the primary caretaker determination was to be based on the parent/child relationship as it existed at the time of separation (or the interruption of functioning of the full family unit). *See id.* at 714.

However, the majority then proceeds to affirm the trial court's finding that neither party was the primary parent in the face of *overwhelming* evidence in the record that appellant (Allen) was the primary parent

and that the bond between him and Joshua was very strong.

At the hearing for temporary custody during the separation proceeding, both parties essentially testified that each was the primary parent. However, respondent's (Jackie's) parents also testified as to whom they believed to be the better parent. Chester Hasbargen (Jackie's father) testified that "In my opinion, I would say Al would be the better parent," and that he thought appellant (Allen) was more able to care for the day-to-day needs of the child. Lois Hasbargen (Jackie's mother) testified that there was a "very, very strong bond" between appellant and Joshua, that appellant could provide a more secure home for the child, that he could better meet the day-to-day needs of the child, and that respondent "cannot handle full responsibility, or the pressure of taking care, or full charge of the child."

Approximately one year later, the hearing for permanent custody was held. In the meantime, respondent had between 40 and 50 counseling sessions with Dr. John Husted. At the hearing, Husted testified that in the past respondent had been something other than healthy, stable, and normal, and that her prior *two* marriages were a reflection of her lack of stability. Her MMPI showed some abnormalities. Husted testified that he saw appellant for marital counseling and that his MMPI was normal. Husted testified that his perception of the family when he first knew them (shortly after the separation hearing) was that appellant was the primary keeper of the children, that he would wake them, change the diapers, feed them, and put them to sleep and take care of them. Husted made no other observations as to who was the primary parent at the time of separation.

At the final custody hearing, respondent's mother again testified and stated that her opinion about her daughter had changed in the past year. However, Lois also read from some notes she had written shortly before the temporary hearing. In those notes, she stated that appellant was the better parent, that there was a strong, loving bond between father and son, and that he was always there for the children. Lois stated that her daughter was very unstable, that she did not put her children first, that she could not take full responsibility for the children, that she is unwilling to accept blame for anything, that she threatens people to get her way, and that she does not face the reality of what she does to others.

This is a very hard thing for us to do, meaning my husband and myself, but we cannot sit by and sit—Jackie doing to her children and husband Number 3. We love her very much but we feel we cannot stand by and see this pattern of her past life be repeated.

* * . * Jackie is very unstable as she goes from one thing to another. She is dissatisfied in everything she does. * * It seems animals seem to come first. We feel her children don't come first. * * * Jackie likes running around, going out at night a lot, and she likes to sleep in late. She doesn't like to get up and take care of the children until she feels like that.

* * * She gets bored with everything very easily and she always likes to leave the children when other things are more important to her.

Lois testified that the notes were the truth at the time they were written.

Also at the final custody hearing, many other friends and neighbors testified that appellant was the primary parent and that there was a very strong bond between him and Joshua. Many persons testified that appellant was also the primary parent for Jason, respondent's son from a *prior* marriage.

In its post-hearing order denying a new trial, the trial court made the finding that, at the time of the separation hearing, neither party was the primary parent. In light of all the evidence, that finding is clearly erroneous. The evidence is overwhelming that appellant was the primary parent at the time of separation.

The trial court apparently reached its conclusion by considering the changes that

occurred between the separation and the final custody hearing. That was an erroneous application of *Pikula,* which requires the trial court to make its primary parent determination based on the facts as of the time of separation.

Since it is very unlikely that a record could be more conclusive that the father was the primary parent, I must suggest that fathers have in effect lost all rights to custody notwithstanding the statutory mandate that a court "shall not prefer one parent over the other solely on the basis of the sex of the parent." Minn.Stat. § 518.-17, subd. 3 (1984).

Because the evidence is clear that appellant was the primary parent at the time of separation and because there is no evidence that appellant is unfit to be the custodian, the trial court abused its discretion in awarding permanent custody to respondent. I would reverse the trial court and award custody to appellant.