In re the Marriage of Mary Lou
(Fischer)   WHITMORE,
petitioner, Respondent,

v.

Leonard H. FISCHER, Appellant.

No. C5–86–377.

Court of Appeals of Minnesota.

Dec. 9, 1986.

Lois A. Paulson, Legal Aid Service of Northeastern Minnesota, Duluth, for respondent.

Carol M. Person, Fryberger, Buchanan, Smith & Frederick, P.A., Duluth, for appellant.

Heard, considered and decided by RANDALL, P.J., and FOLEY and HUSPENI, JJ.

## OPINION

FOLEY, Judge.

Leonard Fischer appeals from a judgment awarding respondent Mary Lou (Fischer) Whitmore custody of the parties' two minor children and from an order denying his motion for a new trial. On appeal, Fischer claims that the custody award constitutes an abuse of discretion because it is based on erroneous findings by the trial court relating to alleged physical and sexual abuse of the children by the stepfather. Fischer further contends that the trial court abused its discretion in limiting a child psychiatrist's cross-examination testimony and in excluding the proffered testimony of a child psychologist. We affirm.

## FACTS

Fischer and Whitmore were married on April 27, 1970. The parties had a daughter in 1974 (D.F.) and a son in 1976 (E.F.). In June 1979, Fischer removed the children from the parties' residence in Indiana and took them to Wisconsin. In August 1981, the marriage was dissolved pursuant to a Wisconsin decree after Whitmore failed to respond to published notice of the action in a Wisconsin newspaper. It is undisputed that Whitmore was never personally served with notice of the action.

Whitmore claimed that she had no knowledge of the children's whereabouts until September 1981, when Fischer contacted Whitmore's mother, Beatrice Shvegel, and told her that Whitmore could visit the children. Whitmore traveled to Wisconsin and returned to Minnesota, where the children began living with Whitmore and her second husband, Donald Whitmore. Fischer had acquiesced in removal of the children from Wisconsin with the understanding that Shvegel would assume guardianship. He was first informed of the living arrangement when he called Shvegel a few days later.

In a subsequent phone conversation, E.F. allegedly told his father that Donald Whitmore had "hit him in the mouth." Fischer contacted various social and law enforcement agencies in Wisconsin and Minnesota seeking return of the children on grounds of neglect and abuse. His efforts proved unsuccessful.

On May 6, 1982 without Whitmore's knowledge or consent, Fischer removed D.F. from her school in Duluth, Minnesota and took her back to Wisconsin. Fischer testified that he acted in reliance on an attorney's advice and under the apparent authority of the Wisconsin decree. The same day, Whitmore filed a petition in Minnesota for custody of the children. An ex parte order was issued granting her temporary custody and restraining both parties from removing the children from Minnesota. On June 3, 1982, Fischer made a

special appearance through his attorney, challenging the Minnesota court's jurisdiction and accusing Whitmore of abusive treatment. On June 21, 1982, Fischer forcibly removed E.F. from Whitmore's home and took him back to Wisconsin.

Following a hearing on June 27, 1982, the Minnesota court issued a temporary order assuming jurisdiction of the matter under the Uniform Child Custody Jurisdiction Act, Minn.Stat. § 518A (1980). Whitmore was awarded temporary custody, with the issue of visitation reserved until the children were returned to Minnesota. On August 17, 1983, in accordance with the temporary order, a Wisconsin court ordered that immediate physical custody be granted to Whitmore.

When the children returned to Minnesota, Whitmore moved for permanent custody. Fischer filed a counter-motion, alleging that the children had been physically and sexually abused while in Whitmore's care from September 1981 to June 1982. At trial, the following testimony was heard on these allegations of abuse.

*Physical Abuse*

1. E.F. told Fischer that Donald Whitmore had "hit him in the mouth" in September 1981.

Robert Jokela, a St. Louis County social worker, summarized the results of an investigation into this allegation, stating:

> The initial intervention unit of our agency responded by visiting the family, by observing their environment and discussing the request of the father to return the children to him. And the initial intervention unit found the children's care to be adequate and chose not to offer the assistance in returning their children to the father.

2. Donald Whitmore broke D.F.'s arm in December 1981.

Fischer initially testified that D.F. first told him Donald Whitmore broke her arm when they returned to Wisconsin in May

1982 and that such allegations prompted him to take D.F. to Eloise Whitney, director of a rape/violence center in Wisconsin. He then testified that he knew nothing about the incident until D.F. volunteered the information during a session with Whitney. Whitney testified that when asked to explain the incident, D.F. stated that she had been playing with a light switch, that Donald Whitmore told her to stop and that he broke her arm when she refused. Whitney noted:

> [A]t that point in time her attitude, her reaction, the way she talked to me, the way she described the playing with the light switch, how the arm was broken, where he hit her, how he hit her, just her whole attitude led me to draw the conclusion that the physical allegations that she was making at the time [were] valid.

Dennis Hojna, a social worker referred to the case by Whitney, testified that D.F. also told him that her stepfather broke her arm and that the consistency of the stories strengthened D.F.'s credibility. Hojna concluded that D.F.'s statements regarding physical and sexual abuse by her stepfather were not prompted by Fischer and Whitmore.

Donald Whitmore testified that the injury occurred when he was playing with the children and that E.F. accidentally jumped on his sister's arm. He also stated that D.F. could have broken her arm when she tripped and fell on the sidewalk the following day. Whitmore corroborated Donald Whitmore's initial explanation for the injury, stating that D.F. told her that E.F. jumped on her arm. Dr. Ryan Jagim, a psychologist, testified that during interviews with the children in the spring of 1985, both stated that D.F.'s arm was broken when E.F. jumped on it accidentally.[1]

3. Fischer discovered that Donald Whitmore struck E.F. in the back of the head in March 1982.

St. Louis County officials intervened and were able to substantiate this incident, al-

---

**1.** Apparently a fourth explanation was offered for D.F.'s injury—that it occurred when a door was accidentally shut on her arm. Medical reports by an examining physician, however, did not corroborate this version.

though Donald Whitmore claimed it was an accident and testified that he had intended to give E.F. a pat on the back.

A report prepared by social worker Judy Sietz noted that Donald Whitmore was initially reluctant to talk about the incident and was under a great deal of stress at the time. Sietz concluded in 1982 that the family was in risk of further abuse occurring. Reports referred to by Jokela from 1982 also included the observations of social worker Gordon Carlson that "[t]he children do have marks periodically and the parents contradict themselves." Carlson further noted an uneasiness within the Whitmore household and proposed a long-term social worker.

### Sexual Abuse

Fischer claimed that Donald Whitmore sexually abused D.F. in 1981/82. Both Whitney and Hojna testified that D.F.'s increased episodes of sexual activity indicated that she had been sexually abused. According to Whitney, D.F.'s anxiety and deliberate nonresponsiveness when asked if she was touched inappropriately, lead her to believe "there was something going on there" and that referral to Hojna was necessary. She acknowledged, however, that D.F. did not appear to understand questions concerning inappropriate touching and that it was possible for a child of her age to react in response to what she believed others wanted to hear. Hojna testified that D.F.'s increased anxiety when asked about sexual abuse and her consistent statements about inappropriate touching by Donald Whitmore had led him to believe D.F. was sexually abused and that Donald Whitmore was the abuser. When asked to explain why D.F. had previously denied similar allegations, Hojna stated:

[W]hen she was in the custody of her father and stepmother in Wisconsin she shared incidents of abuse with myself and other people when she felt secure enough to do that and trusting enough to do that. * * * Also, I would strongly suspect that she had gotten the message by this time that to talk about this stuff [while in the custody of the Whitmores

had done] nothing but to make a situation full of more turmoil for her, for her brother, and * * * all the other people involved * * *.

The other experts testifying at trial, however, concluded that these allegations of sexual abuse could not be substantiated. James Pierce, a Duluth social worker, admitted that his involvement with D.F. was limited to setting up a learning disability program for her during the 1981/82 school year. He nevertheless stated that none of her comments during that time led him to suspect either physical or sexual abuse and that although D.F. initially had problems cooperating with her peers, "I think it's important to note it was never to the extent that anyone felt that she needed to be referred for any kind of extra help at school."

Jokela testified based on his observations of the Whitmore family from December 1983 to October 1984, and stated that he considered the Whitmore home "a safe home, a safe environment from what I could determine from my first few visits." He further explained:

I was very concerned about situations where a home is made to appear something that it usually is not and I got the strong feeling after many of these visits that the home that I saw on my visits was generally the atmosphere when I was not there.

When asked specifically whether the children at any time indicated that they were in danger of being physically or sexually abused, Jokela testified: "During my visits I got no impression that the children were being abused in any way, shape or form." He admitted, however, that he was unaware of the allegations against Donald Whitmore at the time and that had he known, "[i]n retrospect, I would have done more."

Dr. Jagim explained that D.F.'s increased episodes of sexual activity did not necessarily substantiate that she was being sexually abused:

That in and of itself does not mean that there has been sexual abuse, just that

the child is under some type of stress. In this particular case, it was difficult to figure out whether that was the result of sexual activity or sexual abuse versus the issue of the kids going back and forth many times unexpectedly and not under the best of circumstances. So I was unable to distinguish which of those were the sources of that behavior.

Dr. Harvey Green, a psychiatrist, testified based on his independent observations of D.F. during three evaluations and from conclusions drawn in a report by Dr. Stephen Olmsted, a psychologist whom he had referred to the case. Dr. Green explained that his initial contact with D.F. stemmed from problems she was experiencing with her vision shortly after her return to Whitmore's custody in August 1983. He diagnosed the problem as hysterical blindness, non-organic in nature and most likely attributed to environmental stress.

Dr. Green further noted that subsequent interviews with D.F. illustrated that she had ambivalent feeling toward her father and that "[s]he was quite firm in saying that she did not want to live with [him] but that she wouldn't mind visiting * * * and wondering how he is doing." Dr. Green recommended further treatment for D.F. and acknowledged that Dr. Olmsted's report found D.F. was experiencing "significant signs of emotional disturbance and instability."

Dr. Green had also treated E.F. Based on his own observations from 25 sessions with E.F. and on conclusions drawn in Dr. Olmsted's report, Dr. Green concluded that E.F.'s "prognosis [was] good with a secure home environment and consistent and firm school environment." He further noted that recent sessions indicated a willingness on E.F.'s part to re-establish ties with his father through visitation but that the child did not want to live with his father.

During Dr. Green's testimony, the trial court made the following inquiry:

THE COURT: Doctor, with respect to all of the opinions that you have given now with respect to [D.F.] * * * are those opinions given * * * to a * * *

psychiatric certainty * * * [or] to a medical certainty? * * * Can you tell me today whether [D.F.] was sexually abused by Mr. Whitmore?

THE WITNESS: No.

THE COURT: All right. Can you tell me today whether [E.F.] was physically abused by Mr. Whitmore?

*　　*　　*　　*　　*　　*

THE WITNESS: No. He never mentioned to me that he was hit by the stepfather.

Dr. Green ultimately concluded that E.F. would benefit by remaining in Whitmore's custody. Fischer objected, arguing that Dr. Green was unqualified to make a custody recommendation. The objection was overruled. During cross-examination Fischer's attorney proceeded to ask a number of hypothetical questions concerning possible physical and sexual abuse of children, many of which were based on Whitmore's own experiences as an abused child. The trial court interjected:

THE COURT: Just a minute, Counsel. I have let you do this because there has been no objection from the other side but your questions are so speculative.

[FISCHER'S ATTORNEY]: Judge, can I speak?

THE COURT: He has already indicated that he cannot answer these questions to a medical certainty so that the hypotheticals are all out the window.

*　　*　　*　　*　　*　　*

[FISCHER'S ATTORNEY]: * * * Your Honor, we have here available to us for the first time in this case a child psychiatrist who has some special training and some special education and knowledge about physical abuse and sexual abuse of children in general and I feel that it would be helpful to the Court in evaluating the testimony of Dennis Hojna in particular and Eloise Whitney * * *—to have this general information available from a child psychiatrist about whether generally a psychiatrist would believe the allegations of abuse.

THE COURT: [Dr. Green] has already told us, or told me, that he cannot say that either [D.F.] or [E.F.] were abused either physically or sexually.

\* \* \* \* \* \*

[FISCHER'S ATTORNEY]: My purpose, Your Honor, is not to ask this witness to speculate but it's so helpful to have someone available to the Court who has a background in child psychiatry in this case and I think there are opinions that we attempt to elicit from experts in many cases that don't particularly relate to the specific facts of the case.

\* \* \* \* \* \*

THE COURT: *Now, do you want to ask your hypothetical about Donald Whitmore?*

[FISCHER'S ATTORNEY]: Well, I understood the Judge was overruling that.

THE COURT: *No, go ahead.*

(Emphasis supplied).

On November 8, 1985, approximately one and a half months after the close of testimony, Fischer made an offer of proof to include testimony by Dr. Olmsted that D.F. was sexually abused. This proffered testimony was excluded after the trial court agreed with Whitmore that the evidence was merely cumulative since Dr. Olmsted's full report had already been admitted into evidence.

Based on the testimony at trial and the evidence submitted, including the guardian ad litem's written recommendation, the trial court found that the best interests of the children would be served by awarding Whitmore permanent custody subject to liberal visitation by Fischer. This appeal followed denial of Fischer's motion for a new trial.

### ISSUES

1. Did the trial court clearly err in finding that the children's best interests would be served by placing them in Whitmore's custody?

2. Did the trial court err in limiting the cross-examination testimony of a child psychiatrist and in refusing the proffered testimony of a child psychologist?

### ANALYSIS

1. In custody cases, appellate review is limited to whether the trial court abused its discretion by making findings unsupported by the evidence or by improperly applying the law. *Pikula v. Pikula,* 374 N.W.2d 705, 710 (Minn.1985); *Jorschumb v. Jorschumb,* 390 N.W.2d 806, 810 (Minn.Ct. App.1986), *pet. for rev. denied,* (Minn. Aug. 27, 1986). In making a custody determination the trial court must make written findings that reflect proper consideration of the "best interest" factors set forth in Minn.Stat. § 518.17, subd. 1 (1984). *See Rosenfeld v. Rosenfeld,* 311 Minn. 76, 82, 249 N.W.2d 168, 171 (1976); *see also Petersen v. Petersen,* 394 N.W.2d 586 (Minn.Ct. App.1986); *Jorschumb,* 390 N.W.2d at 812.

*Best Interest Factors*

This court must initially examine the trial court's findings and determine whether those findings reflect proper consideration of the "best interest" factors. If this threshhold requirement is not met, it is unnecessary to determine whether the findings are clearly erroneous. The matter must be remanded for further consideration.

A trial court is not bound to consider every "best interest" factor. Rather, it is "sufficient if the findings as a whole reflect that the trial court has taken the statutory factors into consideration, in so far as they are relevant, in reaching its decision." *Rosenfeld,* 311 Minn. at 83, 249 N.W.2d at 172. In this case, the trial court's findings clearly reflect thoughtful consideration of the statutory criteria. In relevant part, the trial court found:

19. Both children consistently have expressed a preference to remain in the custody of [Whitmore]. [*See* Minn.Stat. § 518.17, subd. 1(b).]

20. Although the children show affection toward [Fischer], they have a much closer relationship with [Whitmore]. Further, the children themselves, have a

very close relationship. [*See* Minn.Stat. § 518.17, subd. 1(c).]

21. The children are emotionally and psychologically fragile due to past changes in custodians, and a change of custodian would cause further emotional damage by disrupting their relationship with [Whitmore]. [*See* Minn.Stat. § 518.-17, subd. 1(d), (e), (f).]

22. The children get along well with their stepmother, Beverly Fischer. [*See* Minn.Stat. § 518.17, subd. 1(c).]

23. The children show obvious and appropriate affection toward their stepfather, Donald Whitmore. [*See* Minn.Stat. § 518.17, subd. 1(c).]

24. With respect to allegations concerning Donald Whitmore's abuse of the children, these reported incidents occurred in 1981 and 1982. There have been no incidents reported since then, and the children's present positive interaction with Donald Whitmore indicate no abuse has taken place since 1982. [*See* Minn.Stat. § 518.17, subd. 1(c), (f), (g), (h).]

25. Allegations concerning sexual abuse of [D.F.] cannot be substantiated. [*See* Minn.Stat. § 518.17, subd. 1(g).]

26. Both children are making progress in school and [E.F.] is making progress in therapy with Dr. Harvey Green, child psychiatrist. Both children need continuing counseling. [*See* Minn. Stat. § 518.17, subd. 1(d), (g).]

27. [Whitmore] has been very active in dealing with the children's learning and behavioral problems through school programs. [*See* Minn.Stat. § 518.17, subd. 1(h).]

28. Both children have adjusted to their home and community. [*See* Minn. Stat. § 518.17, subd. 1(d).]

29. The children have been with [Whitmore] for two years and continuing this arrangement will provide them with a very important source of certainty and stability. [*See* Minn.Stat. § 518.17, subd. 1(e), (f).]

30. Both parties love the children, however neither party actively fosters the children's affection and respect for the other party. [*See* Minn.Stat. § 518.-17. subd. 1(a).]

*Evidentiary Support for Findings*

Fischer claims that findings 24 and 25 are clearly erroneous because the evidence overwhelmingly shows that Donald Whitmore physically abused both children and sexually abused D.F. Fischer also asserts that finding 19 must be discounted because the children expressed a preference to remain with their mother when they were under the influence of an abusive step-parent.

■ While it would have been preferable for the trial court to specifically determine in finding 24 whether incidents relating to Whitmore's physical abuse of the children in 1981 and 1982 were substantiated by the evidence, the trial court implies that even if these past incidents were substantiated it would not affect its custody decision since the children exhibit "present positive interaction with Donald Whitmore indicat[ing] no abuse has taken place since 1982." We agree that the proper focus here is whether the children's best interests are *presently* served by awarding custody to Whitmore.

■ The central issue is whether the evidence supports a conclusion that any abusive behavior has continued or will likely continue so that the children's best interests would not presently be served by placing them in such an environment. We find nothing in the record to compel such a finding. To the contrary, Fischer acknowledged at oral argument that no incidents involving Donald Whitmore's alleged abuse of the children have been reported since 1982.

Particularly noteworthy is the guardian ad litem's report recommending that the children's best interests would be served by remaining with their mother:

The children would probably be traumatized by yet another change in possession, so possession should not be changed absent compelling reasons. I am very concerned about the possibility

of past abuse of the children but they seem to be greatly improving in their present environment and there has been no evidence of any abuse for over two years. If there has been past abuse by Mr. Whitmore, I believe the change in possession would still have more detriments than benefits.

■ Nor is the trial court's determination in finding 25 that allegations concerning sexual abuse of D.F. could not be substantiated clearly erroneous. Dr. Green, Robert Jokela and James Pierce all reached this same conclusion. The conclusions of Eloise Whitney and Dennis Hojna that Whitmore sexually abused D.F. stem primarily from the child's consistent responses that Whitmore touched her inappropriately. No details however, were provided through either witness on the extent of the touching or the length of time over which these alleged actions occurred.

Moreover, while the evidence suggested that D.F.'s increased episodes of sexual activity could indicate sexual abuse, Dr. Jagim explained that such action could also be attributed to stress. Resolution of this conflicting testimony was an issue for the trial court. Absent a "definite and firm conviction that a mistake has been made," a trial court's assessment as to witness credibility will not be disturbed by this court. *Hollom v. Carey*, 343 N.W.2d 701, 704 (Minn.Ct.App.1984).

■ 2. Fischer claims that the trial court erred in restricting Dr. Green's testimony and in rejecting the proffered testimony of Dr. Olmsted. We find little merit to Fischer's first contention because he was allowed to proceed once it was established that counsel was eliciting the hypothetical information for background purposes. Furthermore, we agree that Dr. Olmsted's proffered testimony was merely cumulative evidence because his entire report was admitted into evidence without objection, because much of Dr. Green's testimony was based on findings in the Olmsted report, and because the trial court expressly considered "the testimony, the Court ordered custody *and psychological evaluations,* [and] the written report of [the] Guardian ad Litem." (Emphasis supplied.) Exclusion of the proffered testimony was therefore not an abuse of discretion.

### DECISION

The trial court did not abuse its discretion in awarding Whitmore custody of the children based on a finding that their best interest would be served by such a disposition. The trial court did not err in limiting the cross-examination testimony of a child psychiatrist and in refusing the proffered testimony of a child psychologist whose report was admitted into evidence and relied upon by the trial court in making its custody determination.

Affirmed.