In Re the Marriage of Nancy J. SINSA-BAUGH, f/k/a Nancy J. Heinerscheid, petitioner, Appellant,

v.

**Paul Rene HEINERSCHEID,**
**Respondent.**

**No. C4–88–469.**

Court of Appeals of Minnesota.

Aug. 30, 1988.

Edward M. Glennon, Jerrold F. Bergfalk, Lindquist & Vennum, Minneapolis, for appellant.

Lowell J. Noteboom, Robert L. Barrows, Leonard, Street and Deinard, Minneapolis, Raymond W. Faricy, St. Paul, for respondent.

Considered and decided by FOLEY, P.J., NORTON and IRVINE,* JJ.

## OPINION

L.J. IRVINE, Acting Judge.

This is an appeal from a custody proceeding wherein respondent Paul Heinerscheid was granted physical custody of the parties' minor child. Appellant Nancy Sinsabaugh claims the trial court erred in failing to apply the primary parent doctrine established in *Pikula v. Pikula*, 374 N.W.2d 705 (Minn.1985) as of the parties' date of sepa-

---

* Acting as judge of the court of appeals by appointment pursuant to Minn. Const. art. VI, § 2.

ration. She further claims the trial court abused its discretion in finding that the best interests of the child were served by granting respondent custody, and in failing to award attorney fees. We affirm.

## FACTS

Appellant Nancy Sinsabaugh and respondent Paul Heinerscheid were married in 1979. Their only child was born in July 1982. In September 1984, the parties separated, and Sinsabaugh moved to Boston, Massachusetts. Heinerscheid remained in Minnesota with the parties' child.

In the spring of 1985, the parties began negotiating a joint legal custody plan with alternating physical custody. Under the stipulation, Sinsabaugh would retain physical custody in Massachusetts during the 1985–86 school year, while Heinerscheid would retain custody during the 1986–87 school year. If the parties could not reach a custody agreement after August 31, 1987, the issue would be submitted for judicial resolution. The stipulation was incorporated into the October 1985 dissolution order and judgment.

In April 1986, Heinerscheid met Christine Work, and they were married in June 1987. Work is the mother of two children from a previous marriage, and quit her job to spend more time caring for the children.

The parties were unable to reach an agreement regarding custody, and the trial court heard the matter in November 1987. Each party testified that they were the child's primary caretaker at the time of the separation and in the three years prior to the hearing. They further testified as to the educational programs and socialization of the child in their respective locations. Both claimed to have a close, loving relationship with the child. Moreover, both introduced the testimony of friends and neighbors regarding the child's living environment, and their parent-child relationship.

A psychologist retained by Sinsabaugh performed a custody evaluation, and concluded that Sinsabaugh was more emotionally suited for custody of the parties' child. Heinerscheid asked the psychiatrist the parties originally retained to evaluate custody to prepare a custody evaluation for the custody proceeding. The psychiatrist concluded that it would be in the child's best interests if Heinerscheid was granted custody.

The trial court awarded custody to Heinerscheid. The court found that the "primary caretaker" test set out in *Pikula* was inapplicable because three years had passed since the separation and two years had passed since the dissolution. The court determined that even if *Pikula* were applicable, both parties participated in caring for the child since the separation, with Heinerscheid being the primary caretaker from September 1984 through November 1987. In determining custody, the court followed the relevant factors set out in Minn.Stat. § 518.17 (1986) to determine the best interests of the child. After application of the factors to the facts of the case, the court determined that the best interests of the child favored a grant of custody in favor of Heinerscheid. The court refused to award Sinsabaugh attorney fees.

The trial court issued an amended judgment and decree on January 4, 1988, consistent with the December order. Sinsabaugh's subsequent motion for a new trial or amended findings was denied.

## ISSUES

1. Did the trial court err in failing to apply the primary parent doctrine as of the parties' separation date?

2. Did the trial court abuse its discretion in determining the best interests of the child were served by granting respondent custody?

3. Did the trial court abuse its discretion in failing to award attorney fees?

## ANALYSIS

■ 1. Appellate review of custody decisions is limited to determining whether the trial court abused its discretion by making unsupported findings or improperly applying the law. *Pikula*, 374 N.W.2d at 710. The trial court's findings must be sustained unless they are clearly errone-

ous. Minn.R.Civ.P. 52.01; *Pikula*, 374 N.W.2d at 710.

The trial court must make a custodial placement that will serve the best interests of the child. Minn.Stat. § 518.17, subds. 1, 3 (1986). The children's best interests are served by placing custody with the child's primary parent unless other considerations indicate the primary parent would be an unstable custodian. *See Pikula*, 374 N.W.2d at 711.

The primary caretaker determination must be made "at the time the dissolution proceeding was commenced." *Id.* at 714. The Minnesota Supreme Court interpreted the timing of the custody determination as follows:

The phrase "at the time the dissolution proceeding was commenced" is used to indicate the point in time at which the family relationships were physically disrupted by events leading to the dissolution of the marriage, e.g., *at the time of the parties' separation or the interruption of the functioning full family unit.*

*Id.* at 714 n. 3 (emphasis added).

Sinsabaugh contends the trial court erred in determining that *Pikula* was inapplicable because three years had passed since the parties' separation. However, the Minnesota Supreme Court recently ruled that the *Pikula* analysis is applicable only when the separation date and the trial date are reasonably close. *Sefkow v. Sefkow*, 427 N.W.2d 203, 213 (Minn.1988). The supreme court held as follows:

*Pikula* dictates that the primary parent of a very young child be determined as of the date of separation. *Only if this date is reasonably close to the actual trial does the Pikula analysis have any viability.* We further emphasize that it is truly in the best interests of the child to have permanent custody fixed as quickly as possible to avoid the limbo of a [child] and to furnish much-needed stability at this difficult time.

*Id.* (emphasis added). Given the three year period between the separation date and the trial date, we find that the trial court did not err in applying the best interests of the child analysis as opposed to applying the primary parent analysis under *Pikula.*

2. The trial court's findings in custody determinations will be sustained unless they are clearly erroneous. *Pikula*, 374 N.W.2d at 710. Minn.Stat. § 518.17, subd. 1 (1986) lists relevant factors in determining the best interests of the child, in pertinent part, as follows:

(c) The interaction and interrelationship of the child with a parent or parents, a sibling, and any other person who may significantly affect the child's best interests;

(d) The child's adjustment to home, school, and community;

(e) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;

(f) The permanence, as a family unit, of the existing or proposed custodial home;

(g) The mental and physical health of all individuals involved;

(h) The capacity and disposition of the parties to give the child love, affection, and guidance, and to continue educating and raising the child in the child's culture and religion or creed, if any;

(i) The child's cultural background.

Sinsabaugh claims the trial court abused its discretion in determining it was in the best interests of the child to be placed in the custody of Heinerscheid. She contends the court ignored all positive evidence concerning her, improperly emphasized her emotional problems, placed undue emphasis on Heinerscheid's second marriage, and failed to consider the child's educational plans.

The trial court's lengthy findings indicate that all applicable factors listed in Minn.Stat. § 518.17, subd. 1 were considered. In considering Sinsabaugh's mental health, the court followed Minn.Stat. § 518.17, subd. 1(g) and accounted for the "mental health" of one of the individuals involved in the proceeding. The finding that she suffered from serious depression

and anxiety, and continued seeking therapy, was based upon evidence presented, the testimony of both parties, the testimony of Heinerscheid's psychiatrist, and the notes of her own psychologist.

Sinsabaugh claims that both mental health experts acknowledged that she was not unfit to have custody. She testified that her condition has improved, and her psychologist found her an emotionally stable person well suited for parenting. The trial court did not find Sinsabaugh to be an unfit parent, nor do we. Sinsabaugh admitted that she suffered from serious depression and anxiety in 1984, and both Sinsabaugh and her psychologist testified that she continued to undergo treatment twice a week. The psychiatrist obtained by Heinerscheid met with Sinsabaugh in 1987 and reviewed the notes of her treating psychologist. He also testified as to Sinsabaugh's condition, and stated that at the time of trial she was even more anxious. The trial court's findings regarding Sinsabaugh's mental health were not an abuse of discretion.

■ In addition, Minn.Stat. § 518.17, subd. 1 supports consideration of Heinerscheid's second marriage. Factor (c) lists as a relevant factor the child's interaction and interrelationship with "any other person who may significantly affect the child's best interests." Factor (d) lists the child's adjustment to his or her "home" as relevant. Moreover, factor (f) focuses upon the permanence of the "proposed custodial home." The trial court's findings indicate that consideration of Heinerscheid's second marriage was one of several factors used to determine custody. The second marriage was considered only to the extent it related to the factors listed in the statute. Heinerscheid's neighbors testified that his second wife related well to the minor child and provided a positive environment. His psychiatrist, who evaluated custody, testified that the second wife stayed home with the children, provided support, and helped the child feel part of a family. Sinsabaugh even admitted that Heinerscheid's second wife was not a negative influence.

The trial court found that the psychiatrist obtained by Heinerscheid testified that a comparison of the two educational systems was a non-issue. The record indicates that the child's "adjustment" to the school systems in each location was satisfactory. There was significant testimony relating to the child's progress in each school system, and education apparently was deemed a non-issue because both locations offered equally satisfactory programs. The trial court did not abuse its discretion in failing to give the child's educational plans strong consideration.

Finally, Sinsabaugh claims the trial court adopted Heinerscheid's proposed findings, improperly focused only on his positive evidence, and focused only on negative evidence concerning her. The trial court is given the discretion to weigh the evidence and determine the credibility of witness testimony, and this court will not substitute its judgement. *Jorschumb v. Jorschumb*, 390 N.W.2d 806, 812 (Minn.Ct.App.1986). The trial court's findings regarding the testimony of both mental health experts was an exercise of the court's discretion in weighing the credibility of each witness. The record indicates that Heinerscheid's psychiatrist met with the parties on a more extensive level than Sinsabaugh's psychologist. The record further reveals that the meeting between Heinerscheid and Sinsabaugh's psychologist was resisted by Heinerscheid, and that the two did not get along. The trial court reasonably could have concluded that Heinerscheid's psychiatrist was more credible.

■ The finding that Heinerscheid and the child are close and that he provides the child with a predictable environment is supported by the record. Heinerscheid, his second wife, neighbors, and his psychiatrist all testified that he provided the child with a stable environment, and was a good parent. In the end, we find that the court directed specific findings regarding all pertinent factors listed in Minn.Stat. § 518.17, subd. 1, and did not abuse its discretion in determining that it was in the child's best interests to be in Heinerscheid's custody. We are not insensitive to the trauma that can be caused to a mother when a small child is removed from her custody, but we

are also aware of the trauma that can be caused to a child who is removed from a stable situation to which he has become accustomed.

■ 3. An award of attorney fees in dissolution actions largely rests within the trial court's discretion, and will not be reversed unless there is a clear abuse of discretion. *Borchert v. Borchert,* 279 Minn. 16, 21, 154 N.W.2d 902, 906 (1967). Sinsabaugh has incurred attorney fees of approximately $30,960, while Heinerscheid's attorney fees total approximately $50,000. Sinsabaugh's yearly income equals $53,500, and Heinerscheid earned approximately twice that much. Both parties claimed their monthly expenses equalled their monthly net income. The trial court denied the award of attorney fees, noting that each party was capable of protecting their own interest. Given the significant income of each party, we find the trial court did not abuse its broad discretion in failing to award attorney fees.

## DECISION

The trial court did not err in ruling that a primary caretaker analysis under *Pikula* was inapplicable because three years had passed since the parties' separation. The trial court did not abuse its discretion in determining that the best interests of the child were served by granting Heinerscheid custody. Finally, the trial court did not abuse its discretion in failing to award Sinsabaugh attorney fees.

We agree with the concurring opinion of Judge Foley.

AFFIRMED.

FOLEY, Judge (concurring specially).

I fully concur in the result reached in this case but feel obliged to comment on the extraordinarily high attorney fees already incurred by both parties in this case.

This litigation concerns custody of one child, yet to date the mother has incurred fees of $30,000 and the father $50,000. This represents to the mother about two-thirds her annual income and to the father almost one-half his annual income. With respect to additional fees, this court has sustained the trial court's refusal to award

fees to either party and properly so. These are people with good incomes, yet not exceptional in today's economy, but the fees charged to each have escalated to an extremely high point. Extraordinarily high fees are occurring in family law cases with some regularity.

When "no-fault" divorce came on the scene, it was the hope that much of the animosity and emotion that filled so many cases before would be avoided. It seems in recent years that the focus has shifted to extensive custody litigation and, in many cases, property division. In strikes me that if restraint is not practiced in the area of family law litigation, the time will come when only the very wealthy will be able to litigate these matters, and yet custody issues are often at the very heart of family law disputes at all social and economic levels.

Here, these litigants could be considered upper middle class. Yet the briefs reflect that the father was taking out a second mortgage on his home for $40,000 to apply to attorney fees, consultant fees, etc. It seems to me that the $80,000 already spent on attorney fees could have been put to much better use for the child's benefit.

In all areas of the law, we recognize that an attorney is entitled to reasonable fees for services rendered. *See* Minn.R.Prof. Conduct 1.5(a). While the adage is true that "the laborer is worthy of his [her] hire," it is my view that unless some brakes are applied to escalating fees in family law matters, our profession, as well as the procedure, will suffer.

It is incumbent upon attorneys—it is their duty—to dissuade clients from pursuing vexatious and fruitless legal proceedings. They should do all in their power to expedite matters, particularly in custody cases. *See Sefkow v. Sefkow,* 427 N.W.2d 203 (Minn.1988); *see also* Minn.R.Prof.Conduct 3.2.

Chief Judge Wozniak of this court, writing for himself and Judges Crippen and Short, has called attention to unnecessary motion practice that can substantially increase fees, protract animosity and make "enormous fees appear somewhat irrational." *See Fastner v. Fastner,* 427 N.W.2d

691, 702 (Minn.Ct.App.1988). The Minnesota Supreme Court has stated that it "is committed to the policy that courts should follow a conservative policy in awarding attorney's fees." *Borchert v. Borchert,* 279 Minn. 16, 21, 154 N.W.2d 902, 906 (1967) (citing *Burke v. Burke,* 208 Minn. 1, 292 N.W. 426 (1940)). This same policy should be followed by attorneys in privately setting fees. Changes in family law in recent years were never intended to be viewed otherwise but conservative in this area.

I recognize that there are clients who can be most difficult, if not exasperating, in their demands on their attorneys' time in the field of family law practice, but that is when the attorney must stay in firm control of the case and not permit the client to control the lawsuit. Of all civil litigation, perhaps family law and its consequences, including attorney fees, is the most visible.

Here, the matter of fees already incurred was not the dominant issue on appeal, but nonetheless, when we observe a situation (if not reversed) that could eventually harm the profession and its procedure in this area, we have a duty to speak, however unpopular it may be.