**Lorraine OZENNA, Appellant,**

v.

**Michael PARMELEE, Respondent.**

**No. C4-87-8.**

Court of Appeals of Minnesota.

June 9, 1987.

Review Denied Aug. 12, 1987.

Paul W. Onkka, Jr., Southern Minnesota Regional Legal Services, Inc., Carver, for appellant.

Gary M. Peterson, Faribault, for respondent.

Considered and decided by RANDALL, P.J., and WOZNIAK and NIERENGARTEN, JJ., with oral argument waived.

## OPINION

WOZNIAK, Judge.

Appellant Lorraine Ozenna appeals from the second amended judgment and decree granting respondent Michael Parmelee sole legal custody and both of them joint physical custody of their three minor children. She claims the trial court failed to properly apply the *Pikula* criteria when it found that she was not the primary caretaker at any time relevant to the custody disposition. Michael filed a notice of review, seeking review of that portion of the court's order granting the parties joint physical custody.

We affirm that portion of the order awarding Michael sole legal custody of the children. We reverse the award of joint physical custody and grant Michael sole physical custody of the children, and we remand the matter to the trial court to devise a reasonable visitation schedule for Lorraine.

## FACTS

This case is again before us after being remanded for specific findings as to who was the primary caretaker before these custody proceedings were initiated, applying the principles and factors enunciated in *Pikula*. *See Ozenna v. Parmelee*, 377 N.W.2d 483, 489 (Minn.Ct.App.1985). The trial court originally granted Michael sole legal and physical custody of the couple's three minor children. We indicated that on remand the trial court should award custody to the parent who was the primary caretaker unless the children were endangered by such placement. *Id.*

In our earlier decision, we noted the unusual character of this custody dispute, which began nearly five years ago in Alaska. The background information in this case is provided in that decision, and we include only those facts pertinent here.

At the evidentiary hearing on remand held on January 31, 1986, Lorraine submitted an affidavit stating that she provided the majority of daily care for the children up to the fall of 1982. She stated that she taught the children their manners, disciplined them, and had sole responsibility for teaching the children about their Eskimo heritage. She also testified that, if she were awarded custody of the children, she would move to Alaska.

Michael testified that both he and Lorraine shared in the rearing of their children. He submitted an affidavit stating that they both took care of their first child, including feeding, clothing, and changing diapers. He stated, however, that he was increasingly responsible for the children after their second child was born in March 1980. He indicated that Lorraine was dissatisfied with the restrictions that caring for two children imposed and that her inter-

est in her children decreased to the point where she was away from home on a regular basis by the summer and fall of 1982. He said he was responsible for dressing, feeding, changing diapers, and washing clothes.

In the summer of 1982, shortly after the birth of their third child, Lorraine began a fulltime job. She was also spending most evenings playing bingo and drinking. By her own admission, she spent very little time at home that summer and into the fall. She also was hospitalized twice, for two or three days each time, when she made what were referred to as "suicide gestures." Although he did have help from Lorraine's mother who came to care for the children for two months during the summer of 1982, Michael said that during this time he was responsible for getting the children up in the morning, feeding and clothing them, sending the eldest to pre-school, and all other related parenting responsibilities.

Both parties testified at the hearing that they did not want a joint custody arrangement. Lorraine said that she wanted sole custody of the children and was not interested in attending mediation through the Rice County Social Services Department to resolve her differences with Michael concerning the children. Michael testified that Lorraine was not cooperative and refused to discuss general parenting issues.

Following the evidentiary hearing, the trial court issued its amended judgment granting Michael sole legal custody, but awarding both parties joint physical custody. The court continued the custody arrangement which had been established earlier wherein Lorraine had the children from Sunday evening until Thursday evening and Michael had them the remainder of the time.

Subsequently, a supplemental evidentiary hearing was conducted by the trial court limited solely to the issue of Lorraine's alcohol abuse. The trial court in the first trial had also considered evidence of Lorraine's alcohol abuse. There, Lorraine's counselor, the social worker, and the guardian ad litem for the children each voiced concern over Lorraine's use of alcohol. *Ozenna,* 377 N.W.2d at 486. At the supplemental hearing, the testimony was uncontradicted that Lorraine had been picked up for the second time by police officers for public intoxication and transported to a detoxification center for a 72–hour hold. The investigating officer described how he observed Lorraine fall down behind a bar, that she was unable to get up, and that she was extremely intoxicated and unable to care for herself. Lorraine admitted her intoxication, but denied the need for recommended treatment. She said that she did not drink in the children's presence or when she was responsible for the children's care, and that she would not drink if she were awarded custody of the children. Because of the intoxication, she was unable to take the children at the appointed time for transfer of physical custody, which was the second such occurrence in approximately one year. Michael continued caring for the children based on Lorraine's unavailability while she was confined in a detoxification center.

A chemical dependency evaluator, called as a witness by Lorraine, testified that in his opinion Lorraine was chemically dependent and that she had admitted to him that she agreed with this assessment. Lorraine's own witness further stated that, if she continues drinking, her chemical abuse will begin to affect her ability to parent her children and that the increased danger and risk to her children will be unavoidable.

Following this hearing, the trial court issued its second amended judgment. The court did not amend its award of legal custody to Michael and joint physical custody to the parties. It did, however, delete a portion of its earlier finding that both parties were fit and proper persons to have custody of the children. The court then modified the custody arrangement so that Lorraine had the children from Sunday evening to Friday evening. It did this to avoid the disruption of transferring the children from households during the school week.

## ISSUES

1. Are the trial court's findings concerning the primary caretaker clearly erroneous?

2. Did the trial court abuse its discretion in awarding joint physical custody of the children to the parties?

## ANALYSIS

1. Appellate review of custody determinations is limited to whether the trial court abused its discretion by making findings unsupported by the evidence or by improperly applying the law. *Pikula v. Pikula,* 374 N.W.2d 705, 710 (Minn.1985). The trial court's findings must be sustained unless clearly erroneous. *Id.*

■ We believe the court properly considered the appropriate criteria concerning the primary caretaker and, based on the information and facts presented at the hearings, made findings of fact consistent with *Pikula. See id.* at 713–14. At each subsequent proceeding, the court's findings have become increasingly specific that Michael was the primary caretaker and that Lorraine has specific faults which affect her ability to properly care for her minor children. On the other hand, at each stage in the proceeding, the court has nonetheless increased Lorraine's custodial rights to the point where they now exceed Michael's. This is inconsistent.

The *Pikula* decision adopts the general rule governing this case:

> [W]hen both parents seek custody of a child too young to express a preference for a particular parent and one parent has been the primary caretaker, custody [should] be awarded to the primary caretaker absent a showing that that parent is unfit to be the custodian.

*Id.* at 713. Based on the testimony presented at the January 31 hearing and prior hearings, the court made findings regarding the parenting roles of each parent at different times. The court found that both parents were actively involved in the care of their first child, born on December 26, 1977. The court found that by March 11, 1980, when their second child was born, both parents continued to be involved, but that Michael was taking on more of the child care responsibilities based on Lorraine's increased absences from the home. At the time of the birth of the third child on March 21, 1982, the court found that Michael had taken over even more of the child care responsibilities, and that by the summer of 1982, Michael "was almost exclusively providing the child care."

The trial court further found that "the relationship of the parties deteriorated substantially in the summer of 1982." The court's finding is supported by the testimony that Lorraine spent many nights and weekends away from home and was hospitalized twice because of suicidal gestures. In July, Lorraine informed Michael that she would not move to Minnesota with him and the children as earlier planned, effectively resulting in a separation. The threatened separation did occur in the fall of 1982, and a temporary order regarding custody was entered by the Alaska District Court in December 1982.

■ The trial court properly considered the parties' parenting roles up to the time of their separation. The focus of the inquiry in determining the primary caretaker is the time during the marriage. *Hemingsen v. Hemingsen,* 393 N.W.2d 414, 417 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. Nov. 17, 1986). Although never married, the parties lived together as husband and wife until they separated in the fall of 1982.

The court reviewed the parenting roles during the course of the parties' relationship and found that from the time of the first child's birth until the third child's birth on March 21, 1982, "both parties were fairly equally involved in the child care, although [Michael] took on more of the responsibilities as time went on." The court concluded that until March 21, 1982, neither party qualified as a primary caretaker. Thereafter, however, the court found that Michael was clearly the primary caretaker until the time of their separation. In its attached memorandum, the trial court observed: "Although it is difficult to designate one or the other as the primary caretaker over the entire relationship, [Michael] clearly was the primary caretaker during the last year before the parties separated in Alaska. The court believes that

[Lorraine] was never the primary caretaker at a time relevant to a custody disposition." We agree.

The findings made by the court clearly show it rejected Lorraine's allegation that she was the primary caretaker because that allegation had no basis in fact. Evidence presented to the first custody trial on January 8 and 9, 1985, refutes Lorraine's later claims. The Rice County Social Services custody study, dated January 25, 1984, indicates Lorraine admitted to the social worker that while in Alaska she "spent one or two years playing bingo almost every night" and that "she left home for a while because she couldn't study and raise kids."

Additionally, although the trial court was unwilling to label Lorraine unfit, the evidence clearly shows she has had an alcohol problem for many years which she refuses to acknowledge. In the first appeal, this court referred to concerns raised by Lorraine's counselor, the social worker who did the social history, and the children's guardian ad litem regarding Lorraine's alcohol abuse. *Ozenna*, 377 N.W.2d at 486. In 1982, that history of alcohol abuse, suicidal suggestions, and other problems resulted in Lorraine's hospitalization on two occasions.

More recently, on January 8, 1985, and again on February 15, 1986, Lorraine has been found publicly intoxicated and has been transferred to a detoxification center in each instance. On each occasion, her intoxication prevented her from assuming physical custody of the minor children pursuant to the terms of the court's custody order.

We think the trial court minimized Lorraine's alcohol abuse problem, apparently believing that nothing too serious can occur as long as Michael is near and is able to supervise her conduct. In its attached memorandum to the second amended judgment, the court expressed its concern about the problem, but rejected the potential danger of Lorraine's drinking, explaining the court had confidence that Michael would be available to oversee any problems that might occur while the children were in Lorraine's custody. Michael, however, is not always present, nor should he be required to oversee Lorraine's activities as they may affect the children.

After the initial trial, the court considered the statutory factors in Minn.Stat. § 518.17, subd. 1 (1984) and concluded that Michael should be awarded sole legal and physical custody. The subsequent hearing provided additional evidence showing Michael was the primary caretaker parent during the last year before the parties separated in Alaska and that Lorraine was never the primary caretaker at a time relevant to a custody disposition. Furthermore, the hearing addressing Lorraine's alcohol abuse produced additional evidence regarding her faults and habits which, as discussed by her own witness, may seriously jeopardize the safety of the children, given her untreated alcoholism.

The trial court considered all testimony, accepted certain testimony as true, and rejected other claims. The trial court then made its findings of fact, finding specifically that, while the parties lived together as a family unit, Michael had, in essence, emerged from the position of co-custodial parent to exclusive caregiver for the children. The court was clearly justified in finding Michael was the primary caretaker at all times pertinent to this custody determination.

■■■ 2. Once the primary caretaker issue is decided, the primary caretaker is given preference in the physical custody determination over a preference for joint physical custody. *Ohm v. Ohm*, 393 N.W.2d 411, 413 (Minn.Ct.App.1986). Finding that Michael was the primary parent, and because no one disputes Michael's adequacy as a parent, the trial court was then obligated to award primary physical custody of the children to Michael. *Pikula*, 374 N.W.2d at 713.

Although the court recognized Michael's role and responsibility by awarding him sole legal custody of the minor children, the court unfortunately awarded joint physical custody with Lorraine and placed greater physical custody with her. The court's explicit reasoning for its decision is

that Michael can keep an eye on things while the children reside with their mother. Joint custody, however, can never be justified when one parent is called upon to supervise the conduct of the other. We note that the court's decision was also motivated by a concern that the children be exposed to the cultural heritage of their mother. Cultural heritage, however, is only one factor of many in determining the best interests of the children for custodial placement. *Pikula,* as applied here, dictates that custody be awarded to Michael and not jointly with Lorraine, whom he is then called upon to supervise. *Cf. Speltz v. Speltz,* 386 N.W.2d 264, 267 (Minn.Ct. App.1986) (overwhelming evidence establishing primary parent justified a direct award of custody), *pet. for rev. denied* (Minn. June 30, 1986).

■ Moreover, when joint physical and/or legal custody is contemplated, additional factors specified in Minn.Stat. § 518.-17, subd. 2 (1986) must be considered. These factors deal with the ability of parents to relate cooperatively in parenting decisions. Here, the trial court found that the parties had shown an ability to cooperate. The evidence, however, completely contradicts this finding.

The present appeal and the ongoing litigation in this case stem from Lorraine's steadfast refusal to engage in any meaningful form of joint custody of the children. Nevertheless, the court awarded joint physical custody and imposed mandatory mediation as a means of forcing Lorraine to cooperate. Joint custody, however, is not to be used as a "legal baseball bat" to coerce cooperation. *Chapman v. Chapman,* 352 N.W.2d 437, 441 (Minn.Ct.App. 1984). The record shows Michael has made every attempt for joint physical custody to succeed. Lorraine, however, appears persistent in achieving an all-or-nothing resolution, even though that may well be detrimental to the children, as the original custody reports indicated. Because of Lorraine's position, joint physical custody will not work. *See Wolter v. Wolter,* 382 N.W.2d 896, 899 (Minn.Ct.App.1986) (a parent's opposition to joint custody under-

mines the cooperation necessary for joint custodial decisions).

In summary, we cannot condone a resolution of this unhappy dispute wherein Lorraine is awarded joint custody with the tacit understanding that, because Michael is the more reasonable of the two parties and the more flexible, he will make greater sacrifices to follow his children wherever Lorraine will take them or that he will insure their safety while they are in Lorraine's custody. Michael has always been acknowledged by the court's prior decisions to be the more stable parent as reflected in the award of sole legal custody to him.

The trial court has previously ordered, and Michael has not objected to, liberal visitation or co-custody on the part of Lorraine, who now demands that custody and visitation be defined in terms of a custodial parent and a visiting parent. Recognizing that shared custody, no matter what term is used, will not work if Lorraine will not cooperate in that shared arrangement, we acknowledge the need for this court to define contact with the children in traditional physical custody and visitation terms.

## DECISION

The trial court's award of sole legal custody is affirmed. Its decision on joint physical custody is reversed and respondent is granted sole physical custody, subject to a reasonable visitation schedule which the trial court will devise on remand.

Affirmed in part, reversed in part, and remanded.