**In re the Marriage of Warren H. LENZ, Jr., Petitioner, Respondent,**

v.

**Connie P. LENZ, Appellant.**

No. C7–87–827.

Court of Appeals of Minnesota.

Nov. 17, 1987.
Review Granted Jan. 20, 1988.

Bob A. Goldman, Tuveson, Goldman & Nelson, Albert Lea, for respondent.

Daniel M. Mohs, Southern Minnesota Regional Legal Services, Inc., Albert Lea, for appellant.

Considered and decided by WOZNIAK, P.J., and FOLEY and CRIPPEN, JJ., with oral argument waived.

## OPINION

CRIPPEN, Judge.

The trial court granted custody of the parties' child to respondent, Warren Lenz, shortly after their marriage was dissolved. Appellant Connie Lenz challenges the award of custody to respondent, contending that she is the child's primary parent and should have custody of the child. We reverse.

## FACTS

The parties were married on November 20, 1982. Their only child, Steven, was born August 20, 1983. He was approximately 15 months old at the time of their separation in early December 1984.

Judgment of dissolution was entered November 12, 1985, giving temporary custody to respondent. A bifurcated hearing was held on December 11, 1986 on the issues of child custody, visitation, and child support, and respondent was granted physical custody of the child.

At the hearing, the evidence on behalf of respondent consisted of his own testimony and a custody investigator's recommendation that respondent have custody. Five witnesses, appellant, her father, mother, and two friends testified on her behalf.

Respondent's witness, Gary Altfillisch, the director of Court Services in Freeborn County, prepared the custody study entered into the record. He testified that the report was based primarily on the present situations of the parties. The Court Services report stated in support of its recommendation that respondent "has shown himself to be more consistent and responsible in his personal life, as well as in meeting the needs of the child." It said that if respondent were awarded custody, he should be required to take parenting classes. The custody study considered the statutory criteria for the best interests of the child. The study also included interviews with one reference on behalf of respondent and two on behalf of appellant. Attached were chemical dependency evaluations, which concluded that appellant had an "identifiable drinking problem" and that respondent did not. Appellant testified that she had attended Alcoholics Anonymous for the eight months before the hearing and had not had a drink in that time.

Respondent testified that he was primarily responsible for care of the child. Appellant and her witnesses testified that she did the great majority of the feeding, diapering, and bathing of the child and that she usually dropped him off and picked him up from the babysitter. Appellant's father and mother testified that appellant's mother frequently babysat for the child when appellant was at work, during the time respondent was unemployed. Appellant's father and mother testified that respondent would come to their house and sleep in a chair while appellant's mother took care of the child, or that he was not there at all while she babysat.

Appellant's friend Brenda Hovey testified that she worked with appellant for almost two years at a nursing home. Ms. Hovey testified that numerous times appellant received phone calls at work requiring her to pick up the child because the babysitter could not work any longer. Appellant's job was threatened because of all the absences. This occurred partly during the time respondent was unemployed. Ms. Hovey also stated that when she and appellant and respondent socialized, appellant would care for the child if he cried.

The trial court furnished a single finding on the question of custody:

> During the period prior to the separation both parties provided primary care for said child. They depended on babysitters and relatives, to a considerable extent. Neither party was involved with the child to an extent that either could be found to be the primary caretaker.

Based on this finding, the court placed physical custody of the child with respondent.

Appellant then moved for amended findings and judgment, which the trial court denied. In a memorandum the trial court said that the child was often left with babysitters in the 15–month period before the parties separated and that "some things which might have been desirable do not appear to have been provided at all." The court noted that the custody issue was decided according to its best interest; neither the order for judgment nor the post-judgment memorandum include findings on indicia of the child's interests.

## ISSUE

Was it error to conclude that neither parent related sufficiently with their child to be a primary parent, during the 15–month period before the parents' separation?

## ANALYSIS

a. The parents' relationships with their child.

■ The paramount concern in custody determinations is the "best interests of the child," under Minn.Stat. § 518.17, subd. 3 (1986). In considering the best interests of a child, the court is to consider all relevant factors, including those enumerated in the statute. *See Pikula v. Pikula,* 374 N.W.2d 705, 710–11 (Minn.1985).

■ The factors in section 518.17, subd. 1, require that when both parents seek custody of a child too young to express a preference for a particular parent and one parent has been the "primary caretaker," custody is to be awarded to the primary parent absent a showing that the primary parent is unfit to be the custodian. *Id.* at 712; *Ohm v. Ohm,* 393 N.W.2d 411, 413 (Minn.Ct.App.1986). *Pikula* defines the primary caretaker as "the person who provides the child with daily nurturence, care and support." *Pikula,* 374 N.W.2d at 711.

■ *Pikula* lists factors for determining if one or the other parent is the primary caretaker. This requires determining which parent has taken responsibility for, *inter alia,* the performance of the following caring and nurturing duties of a parent:

> (1) preparing and planning of meals; (2) bathing, grooming and dressing; (3) purchasing, cleaning, and care of clothes; (4) medical care, including nursing and trips to physicians; (5) arranging for social interaction among peers after school, * * *; (6) arranging alternative care, * * *; (7) putting child to bed at night, attending to child in the middle of the night, waking child in the morning; (8) disciplining, * * *; (9) educating, i.e., religious, cultural, social, etc.; and (10) teaching elementary skills.

*Pikula,* 374 N.W.2d at 713. Which parent is the primary caretaker should be determined with reference to the time up until the dissolution proceedings, or the separation leading to it. *Id.* at 714.

As *Pikula* makes evident, the Supreme Court expected that "as between any two parents, one will be the primary parent." *Id.* at 714. The court said, however, that it adopted criteria for determining "which, *if either,* parent is the primary caretaker."

*Pikula,* 374 N.W.2d at 713 (emphasis added).

In this case, the trial court found that although "both parties provided primary care" for the child, "[n]either party was involved with the child to an extent that either could be found to be the primary caretaker." In short, the trial court concluded that no real bonding occurred between the child and either parent. In its post-judgment memorandum, the court noted that these conclusions trace to evidence that the parties had a "rocky" marriage before they separated; respondent was unemployed during much of the time; appellant had to return to a nursing job on the 3:00 p.m. to 11:00 p.m. shift; family finances were strained; and appellant was not maintaining sobriety.

As the trial court suggests, the record is replete with evidence of marital discord. However, there is no evidence showing neglect of child care due to preoccupation with marital problems.

■ The trial court next observed that appellant was required by financial exigency to return to work shortly after the child's birth. Appellant and a co-worker of hers testified that appellant was called away from work on several occasions because the babysitter caring for the child had to leave. There was evidence that these incidents threatened appellant's job. Significantly, even when both parties work outside the home, one will generally fill the role of the primary parent. *Pikula,* 374 N.W.2d 714. The difficulties of the family also include unemployment suffered by respondent. This condition, however, did not limit his contacts with his child.

■ The trial court observed that appellant "was diagnosed as being chemically dependent," and, during the marriage, was not maintaining sobriety. Appellant was evaluated twice for chemical dependency since her marriage. One month after the divorce, in December 1985, she was evaluated by a counselor in a county agency. The counselor concluded that the testing indicated "an abuse or problem drinker," and stated that appellant had a psychological dependency. Appellant was again tested in May 1986 by a different counselor, whose diagnosis was that appellant had an "identifiable drinking problem." There is no evidence indicating that appellant's use of alcohol interferred with her parenting. It is undisputed that appellant has brought her drinking habit under control.

The court found that a great deal of the child's care was provided by others. The court failed to consider testimony by both parents and several other witnesses that both appellant and respondent provided a great deal of physical care for the child.

Respondent testified he did the babysitting when appellant was working and he was laid off. He testified he changed diapers, took him to the doctor when he needed his shots, knew the brand of diapers the child used, and was partly responsible for feeding the child during the time he was laid off. He also testified that he would get up during the middle of the night to take care of the baby when he cried.

Appellant testified that she did the laundry, cooking and changing the baby and getting him up, and beyond that she and respondent shared the responsibilities. She also testified that she fed the baby and got up in the middle of the night to care for him. She identified the brand of diapers and formula the baby used, and the fact that the formula had to be changed several times because the baby was iron poor. She also testified that his favorite toy was a puppet frog.

In the custody study, both parents spoke about their plans to attend church with Steven. Respondent has plans for enrolling him in a pre-school. Respondent stated he usually talks to Steven for guidance and discipline, and will spank him when necessary, but prefers not to. He also said he buys special food to meet the child's needs. Both parents are aware of and talked about the child's physical health, and the fact that he is very hyperactive.

Finally, the court stated that some desirable things were not provided at all. The record does not indicate what the trial court had in mind in this regard, and the

transcript does not support the court's conclusion.

The evidence compels the conclusion that both parties were involved in the child's physical care. Moreover, although the *Pikula* factors concern only the physical elements of child care, psychological bonding is at least as essential. *Pikula* recognizes in the primary parent preference "the importance of the bond formed between a primary parent and a child." *Id.* at 712 n. 2.

Although the parties' testimony did not directly address the issue, there was sufficient evidence of their strong bond with the child in the child custody report and the testimony of other witnesses. Most of this evidence was collected over a year after the parties separated, but there is no suggestion in the record that relationships seen then were newly established.

The custody study examined the parties' relationship with their son. The study noted that with both parents (interviewed separately) Steven was very active and seeking attention. Respondent was observed to be "appropriately tolerant to the child" and provided him with activities during the interview. Steven sat on respondent's lap during the first part of the interview. Respondent was observed to be "attentive to Steve's needs" and the interaction between them appeared to be appropriate.

Steven was observed to be "comfortable and familiar in his surroundings" in both of the parties' homes. Respondent said in the study that his present girlfriend gets along fine with the child and the three of them spend time together, for example, going to a local park for "fun time."

A reference for respondent, Natalie Nelson, said that when he and the child visit, Steven sticks close to his father. She said she had never seen respondent seriously discipline his son. She observes a bond between Steven and his father, and has seen them exchange hugs and kisses.

In the custody study, appellant stated that she can give Steven a happy life. She said that they pray together at bedtime. She said Steven has special needs, "specifically, understanding, someone to listen, a home, love, hugs and kisses." With respect to discipline she will tell him "no" when he does not mind and spank him when he really misbehaves, and she said that he minds most of the time. Appellant wrote in her statement for the study that she is suited to care for the child because she loves him, and cared for him from birth, and he loves her. She concluded "Steven needs someone who's going to care for him, love him and listen to him. I don't feel that his father can really take care of him. I know he loves him."

Appellant testified that she started attending Alcoholics Anonymous "for Steve." Her mother testified about appellant caring that "Stevie had got a tooth."

Brenda Hovey, a friend of appellant's, testified that appellant would tend to the child when he needed care, and said "[s]he's a mother who loves her son very much, and she would turn the world upside down for him." She continued:

> She's a very good mother. She, you know, I've seen her punish him, and I've never seen her hit him. * * * If she punishes him, she'll pick him up and she'll set him on the couch, but that's, you know, as far as I've ever seen her go. * * * She's a good mother, and she tries to teach him right from wrong.

Lori Jacobs, a friend of appellant's, testified as to appellant's relationship with her son. "She takes him with her when she goes places, and they get along fine as far as son and mother go." She was also interviewed for the custody study, in which she said that appellant has shown more physical affection to Steven as she has gotten more religious. Another friend, Rachal Larsen–Gaines, said in the custody study that appellant loves her son.

The great weight of the evidence shows that both respondent and appellant have had a loving relationship with their son. Based on this evidence, and the evidence of physical care giver for the child, it was clearly erroneous for the trial court to find that neither parent was involved enough with the child before they separated to be a primary parent under *Pikula.*

■ The evidence shows that appellant filled the role of primary parent. Although the Court Services Report recommended that respondent have physical custody, the report did not evaluate factors relevant to the primary parent determination, and it focused on the time period after the separation.

Appellant testified that primarily she cared for the child, and respondent testified that he was primarily responsible for taking care of the child from the time the child was born until the separation. Where their testimony was contradictory on specifics of child care, respondent's testimony was only general. For example, appellant testified to a particular incident when she stayed up most of the night with the child. Respondent testified that they shared the responsibility of getting up during the night to care for the child. Respondent could not recall if the child had a favorite toy during his first year, but appellant described "a puppet frog" as his favorite toy. Respondent testified that the child was fed Enfamil formula the first year. Appellant stated that he was fed Similac, but that the doctor changed the formula three different times because the child was "iron poor."

Respondent and appellant both testified that appellant did most of the family laundry. Appellant's witnesses testified that appellant or her mother cared for the child almost all of the time that appellant was not at work. Appellant's mother and father both testified that even when appellant was working but respondent was not, and respondent was visiting their home, respondent did not take care of the child. Appellant's mother fed, diapered, and responded to the child when he cried, even when she was busy and respondent was not doing anything. Appellant's father testified that he never saw respondent feed, diaper or bathe Steven.

Respondent did not present evidence to rebut this testimony of appellant's mother and father. Nor did respondent address the testimony of appellant's witness Brenda Hovey regarding babysitting conflicts and their interference with appellant's job. There was no evidence that respondent took any responsibility for picking the child up when conflicts arose, whether during his working hours or when he was unemployed.

Appellant correctly notes that respondent did not present evidence at trial demonstrating that he shared or was primarily responsible for caring for the child, other than his own assertion that he was the primary caretaker. Only on cross-examination did he offer contradiction of appellant's evidence, a statement that he shared changing diapers, feeding the child and getting up with him in the middle of the night.

During the time respondent and appellant were married and living together, they both worked at outside jobs. When respondent was not working, but appellant was, the child was often in the care of babysitters. There was no evidence that the child was with babysitters when appellant was not working. Appellant testified that she did the laundry and the cooking, changed the baby's diapers, and got him up in the mornings and "after that" she and respondent shared the responsibilities.

The evidence on appellant's role as primary parent is compelling. The trial court's findings raise no credibility questions lending support for any other reading of the record.

b. Appellate court review.

The trial court's findings of fact will be upheld unless they are clearly erroneous. Minn.R.Civ.P. 52.01; *Pikula,* 374 N.W.2d at 710. In a custody determination, review is "limited to whether the trial court abused its discretion by making findings unsupported by the evidence or by improperly applying the law." *Pikula,* 374 N.W. 2d at 710.

As indicated in this opinion, we conclude that there is insufficient evidence to support the trial court's finding that neither parent had a legally significant relationship with the child before the couple separated. In addition, the trial court's finding creates an imprecision in the legal standard which is problematic as a matter of law.

In *Pikula,* the supreme court formulated a standard which it intended to be more precise than standards previously employed by the trial courts:

> Imprecision in the application of the law may result in "wrong" results and in unpredictability of outcome. * * * The rule we fashion today should largely remove the issue of custody from the arena of dispute over [dissolution issues]. * * * The inherent imprecision heretofore present in our custody law has, in turn, diminished meaningful appellate review.

*Id.,* 374 N.W.2d at 712, 713.

It is evident that subtle distinctions pose a risk of defeating the precision intended by the supreme court in its formulation of the primary parent preference. The preference is not applied as a wooden rule. *See, e.g., Kennedy v. Kennedy,* 403 N.W.2d 892, 898–99 (Minn.Ct.App.1987) (determining plausibility, under *Pikula* and subsequent cases, for a finding that both parents have equally contributed to care of a child; also announcing deference to trial court on findings that children have attained an age sufficient to express a custodial preference which may supplant the primary parent standard). On the other hand, we are compelled under *Pikula* to avoid decisionmaking which substantially defeats the precision of the supreme court standard.

We conclude in these circumstances that a more insistent approach must be taken on the primary parent preference. At least on the record here, it was destructive of the preference to contend that neither parent had a legally significant relationship with the child. It was incumbent upon the court in the circumstances here to identify the primary parent, and the evidence dictates the conclusion that appellant is that parent. There is no evidence or claim that appellant is unfit to care for the child. We are compelled under the circumstances to reverse the trial court's custody decision.

## DECISION

The trial court clearly erred in its findings resulting in awarding custody to respondent. Custody of the child is awarded to appellant Connie Lenz.

Reversed.

WOZNIAK, Judge (dissenting).

I respectfully dissent.

The record clearly sustains a finding that neither parent was the primary caretaker. Each had his or her own concepts of lifestyle which caused problems with the marriage relationship. Both had employment and economic stress and indicia of alcohol abuse, as well as other problems. Accordingly, the child was seen and cared for primarily by sitters and grandparents.

The trial court found:

> The time period in question was a very brief one. The circumstances were abnormal; the seeds of dissolution had already been planted, and the life of the family was characterized by stress and discord. A considerable amount of Steven's care was provided for him by others. Some things which might have been desirable do not appear to have been provided at all.

> Under these circumstances I could not find that either parent was the primary caretaker. Accordingly, I decided the issue of custody by determining what I found to be in Steven's best interests.

This finding should not be overturned on appeal unless clearly erroneous or manifestly and palpably contrary to the evidence as a whole. Such was not the case here.

It is inappropriate for this court to substitute its judgment for the final assessment by the trial court.