OPINION
Kelly Anne Best appeals from the judgment of the Miami County Common Pleas Court granting custody of her son, Alexander, to her former husband David Charles Kelly, Jr.
Kelly and David were married while both were in the Marine Corps on January 4, 1995 in Okinawa, Japan. Alexander was born on June 24, 1995. In February 1996, the Kellys separated in Virginia. They entered into a separation agreement that provided they would have joint legal custody of Alexander. Kelly would have physical custody of the child with liberal visitation privileges provided David.
In November, 1998, David filed for divorce in Miami County. He requested that the Court issue an order of shared parenting pursuant to the parties' separation agreement. On April 12, 1999, the trial court granted David an uncontested divorce and approved the February 1996 separation agreement and made it part of the divorce decree.
On October 23, 2000, David moved to change the custody of Alexander from Kelly to him "due to a change of circumstances." The matter was referred to a magistrate for initial findings and recommendations. The magistrate appointed a guardian ad litem to represent Alexander's interests and to conduct a home investigation.
The facts are essentially undisputed. Sometime after the parties separated, Kelly moved to Cincinnati to be closer to her family. She went to work as a security officer with Lazarus. In late 1998 Kelly received a promotion and was transferred to a Lazarus store in Lafayette, Indiana. Six months later, she was transferred to Fairborn, Ohio where she stayed for a year and a half. In August 2000, Kelly moved in with her boyfriend and took a job with Lowes in Cincinnati. When she and her boyfriend broke up, she moved in December 2000 to another apartment in Cincinnati.
Kelly testified at the hearing that Alex is a happy, polite, cheerful, wonderful little person. She said he's not shy and he is an active boy who makes friends easily. (Tr. 122-123). She said Alex would be repeating kindergarten because he was having developmental problems such as lack of concentration on homework.
Kelly testified that she initially had a good relationship with David after the divorce. She said she considered David one of her closest friends. Kelly said she encouraged David to have visits with Alex whenever he could. She said that David only exercised his four week summer visitation in the summer preceding the custody motion. She testified she told David about Alex's difficulties with kindergarten and asked him to attend a parent-teacher conference about holding Alex back but he refused to come to the meeting.
Kelly testified that she presently works forty-eight hours a week at Lowes but she was seeking fewer hours to have more time with Alex. She admitted she had worked as much as 60 hours a week at times in the past. She also has remained active in the Marine Corps Reserves with one weekend drill a month and a two week summer camp. She admitted that Alex could be in school and daycare for up to nine hours a day.
Kelly said her parents lived in Mason, Ohio thirty minutes from her and her brothers also live in Cincinnati. She said Alex has a very close relationship with her parents and her brothers and their families. Kelly provided the court with pictures of her apartment in Price Hill in Cincinnati. It depicts a very clean, neat, and attractive residence. Kelly said Alex had his own bedroom and she slept in the living room. Kelly said her apartment is in a nice area of Cincinnati "but with all large cities you have to drive through a bad area to get to a good one." (Tr. 93).
David testified he filed the change of custody motion because of the many moves made by Kelly. (Tr. 23). David said he also had some concerns about Alex that "the older he gets the less outgoing he seems to be." (Tr. 29). He said he thought this might be the result of so many people coming in and out of Alex's life. (Tr. 30). (Presumably a reference to Kelly's boyfriends).
David testified he is employed in his father's business, Kelly Trucking, and works from 6:30 a.m. until 5:00 p.m. daily. David testified he also attends Sinclair Community College a few nights a week. He said he lives with Edna Murphy who he intends to marry. He said Edna has a nine year old boy who lives with them in West Milton, Ohio. West Milton is about one and half hours distance from Cincinnati, Ohio. David testified that Kelly has always been cooperative in giving him visitation privileges. He admitted he didn't attend Alex's parent-teacher conference because of a conflict in schedule and he never met Alex's kindergarten teacher. (Tr. 39).
Edna Murphy testified she had lived with David for two years. She said she has to be at work at 6:00 a.m. in the morning and so she takes her son Michael to her mother's house before she goes to work so Michael can catch the school bus at that location. She said this involves getting Michael up at 5:00 in the morning to take him to her mother's house. Edna testified she gets home at about 3:00 p.m. in the afternoon and meets Michael at the school bus stop in front of their home. If David receives custody of Alex, she testified she would follow the same routine with Alex. She testified she had a good relationship with Alex. (Tr. 51).
David's mother, Patty Kelly, testified she and David's father live in Brookville, Ohio near West Milton and she sees Alex quite a bit. Ms. Kelly testified she works on weekends and is available for babysitting Alex during the week. Kathleen Losekamp, Kelly's mother, testified she and Kelly's stepfather live in Mason near Cincinnati and have a very close relationship with her daughter and Alex.
The guardian, Stephen King, testified he visited both of the parents and found both to be good and loving parents. He said he recommended that physical custody be changed to David because overall the combination of David and Edna and David's mother and father provide a more stable and nurturing life for Alex. (Tr. 13).
In his report, King expressed concern about Kelly's numerous moves and the amount of time Alex spends in daycare. He also expressed concern with Alex's school performance and the fact it occurred on Kelly's watch. On cross-examination, he admitted Alex's relationship with his grandparents in Brookville would not be a heavily weighted factor. He admitted he did not talk to Alex's day care provider or his school teacher although Kelly may have requested he do so. He said, "he didn't blame Kelly for Alex's school problems." (Tr. 17). He admitted his decision about the custody of Alex was a close call. (Tr. 19).
After the hearing, the magistrate recommended that the shared parenting agreement reached by the parties be terminated and that custody of Alexander be awarded to David in the best interests of the child.
The magistrate made several findings in support of his recommendations.
 8. The following are some of the concerns/considerations made [by] the guardian ad litem in making his recommendation that David be named residential parent and legal custodian.
 A. Kelly's apartment is in an unsafe area. Although not a ghetto, it is not a desirable area;
 B. Alex has had to endure inordinate amounts of time at a daycare as a result of the long hours worked by Kelly;
C. Alex has had to move his residence several times;
D. Alex's poor academic performance;
 E. A more stable, nurturing life available in West Milton.
 9. David lives in a single structure home in West Milton that is owned by David's parents. Alex's paternal grandparents live in the West Milton area. He has extended family members in the Delphi area, approximately 45 minutes away.
 10. Alex has had to change his residence several times since the parties separated. Alex has lived in Indianapolis, Fairborn and Delphi.
 11. The guardian ad litem has an outstanding balance of $140.00 for services performed.
 12. Alex has attended three (3) different schools. Alex will be held back in Kindergarten this next school year.
 13. David has had Alex additional times beyond that which is set by this court's parenting time schedule.
 14. David is self employed and earns $21,299.00 each year.
 15. David filed the contempt action alleging that there is a credit card with his name listed as a joint creditor. There is a balance on the card in the approximate amount of $2,000.00. David also contends that there is an outstanding dental bill that is owed by Kelly.
 16. David and Kelly both work long hours at their job. Additionally, David attends classes at Sinclair Community College.
 17. David agrees that Kelly has been David's [sic] primary care provider since Alex was born. David, however, has had significant amounts of time with Alex.
 18. Paternal grandparents live ten minutes away from David and they both have a good relationship with Alex.
 19. Alex currently has some development difficulties with concentrating and with handwriting.
 20. Kelly has been actively involved in Alex's school performance.
 21. David earns $21,399.00 annually and Kelly earns $25,200.00 annually from employment wages. Additionally, Kelly earns $4,000.00 each year from the Marine Reserves.
 22. Neither parent is more likely to facilitate with the parenting time of the other parents.
 23. Based on David's adjusted annual gross income of $20,971.00 and Kelly's adjusted annual gross income of $28,616.00, the Ohio Child Support Worksheet calculates child support from the plaintiff to the defendant in the amount of $345.04 per month per child for one (1) minor child effective August 20, 2001.
 24. It is in the best interest of Alex that David be named residential parent and legal custodian.
Kelly filed objections to the magistrate's report. She argued that the magistrate erred in finding that David's motion for change of custody should be treated as a request to terminate a shared parenting plan as no such plan had ever been submitted to the court. Kelly argued that since she was the residential parent and legal custodian David's motion should have been treated as a "change of custody" motion. She argued that David did not overcome the rebuttable presumption that retaining the residential parent designated in the prior decree is in the child's best interest or that the "harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child." See, R.C. 3109.04(E)(1)(a)(i-iii).
The trial court overruled Kelly's objections. The trial court found that the divorce decree did not comply with Ohio law in regard to awarding shared parenting. The court found however that the parties clearly intended to share the rights and responsibilities of parenting their son. The court also found that Kelly should be estopped from now claiming that the decree established her as the sole residential parent as opposed to establishing shared parenting. The court then noted that upon a motion to terminate a shared parenting plan, the court may terminate the plan if it is determined that the plan is not in the best interests of the child.
The court noted that when a shared parenting plan is terminated, the court proceeds to issue a modified decree for the allocation of parental rights and responsibilities. The court stated "the issue of a change of circumstances is not necessarily reached in the termination of a shared parenting plan and reallocation process." The court said it must consider the factors in R.C. 3109.04(F)(1) in reallocating the parental rights.
The Court noted that it gave weight to the guardian's recommendation because the guardian actually visited both parents and the child at their respective residences. It also stated the court was concerned with the pattern of the child's life to date which had been marked by a number of residences and city changes, long hours in day care, and the child's less than satisfactory adjustment to kindergarten. Finally, the court found that while both parents are loving parents, the opportunity that awaits the child with the father and extended family members in near proximity are in his best interests at this time in his life. The court thus adopted the magistrate's recommendations that David be awarded custody of Alex.
In Kelly's first assignment she argues that the trial court erred in finding that David's motion was a request to terminate shared parenting as no plan for shared parenting had ever been adopted and approved by the court. Accordingly, she argues she was the residential and legal custodian of Alex by virtue of the divorce decree in the absence of a provision for shared parenting. In support of that argument she refers us to R.C. 3109.04(K)(2) which provides:
 (2) A parent who primarily is allocated the parental rights and responsibilities for the care of a child and who is designated as the residential parent and legal custodian of the child under an order that is issued pursuant to this section on or after April 11, 1991, and that does not provide for shared parenting has "custody of the child" and "care, custody, and control of the child" under the order, and is the "residential parent," the "residential parent and legal custodian," or the "custodial parent" of the child under the order.
(Emphasis ours).
David argues that the trial court did not err in treating his motion as one to terminate shared parenting because the court then intended to issue a shared parenting order although it did not adopt a shared parenting plan as required by law. In any event, David argues that Kelly should be estopped from claiming that the prior decree did not provide for shared parenting since that is what she clearly wanted the divorce decree to provide.
Ohio law permitted joint custody prior to 1991 if the parties filed a plan with the court and the court approved the plan and found it to be in the best interest of the children. The plan approved was incorporated in a provisional joint custody decree which was subject to termination for ninety days upon motion of any party or the court. Also the court could terminate the final joint custody decree upon motion of either party or when the court determined it was no longer in the best interest of the children. (See former R.C. 3109.04).
Existing joint custody decrees were not affected by Senate Bill 3 enacted in 1991 which provided for shared parenting. See, R.C. 3109.041. Indeed, the statute provided that "joint custody" would have the same meaning as "shared parenting."
It is also clear that Kelly and David intended that the court provide in their final divorce decree that they have joint custody or shared parenting responsibilities for Alex.
The trial court is in the best position to know what it intended in entering its judgment. We agree with the court that it clearly did not intend to allocate the parental rights and responsibilities for the care of Alex to Kelly as permitted by R.C. 3109.04(A)(1). In short, we agree that the trial court entered a "defective" shared parenting order which was subject to termination on the request of one of the parents or whenever the court determined the order was no longer in the child's best interest. The first assignment of error is overruled.
In her second assignment, Kelly argues that the trial court erred in finding a change of custody was in the best interest of Alex. Kelly argues again that she was awarded custody in the final decree and therefore David was required to overcome the rebuttable presumption that retaining her as Alex's custodian is in his best interest. She argues that the trial court was required to find a change of circumstances since the prior decree and that modification is necessary to serve the best interest of Alex. She also argues the court was required to find that the harm caused by the change in the child's environment is outweighed by the advantages of the change. R.C. 3109.04(E)(1).
After terminating a shared parenting decree, custody is to be determined "ab initio" as if making an initial custody determination. See R.C. 3109(E)(2)(d). See Patton v. Patton (January 23, 1995), Clinton App. CA-94-04-011 unreported.
R.C. 3104.04(F)(1) provides that in determining the best interest of the child, the court shall consider all relevant factors, including, but not limited to:
(a) the wishes of the child's parents.
(b) the wishes of the child if interviewed in chambers.
 (c) the child's interaction and interrelationship with his parents, siblings, and any other person who may significantly affect the child's best interests.
(d) the child's adjustment to home school and community.
 (e) the mental and physical health of all persons involved.
(f) the person more likely to honor visitation.
 (g) whether either parent has honored child support payments.
 (h) whether either parent has been convicted of abusing a child.
(i) whether either parent will live outside the state.
Kelly argues that the trial court erred in determining that the custody of Alex should be awarded to David in his best interests. She notes that she has been Alex's primary care giver since his birth and that she has been actively involved in his school activities. She also notes that Alex was well adjusted to his environment and had many friends and family in the Cincinnati area.
Kelly argues that the trial court gave weight to the long hours she works without noting that David has a similar schedule including night school. Kelly also notes that if custody is changed, Alex will be required to get up at 5:00 a.m. and be taken to Edna Murphy's mother's home until Edna gets off work in the mid-afternoon.
Kelly also notes that the record established that David did not attend parent-teacher conferences with regard to Alex repeating kindergarten. She also notes that the court did not consider her testimony that David did not assist Alex with his homework despite her repeated requests. Lastly, she notes that because of David's work schedule, Alex will be with a non-parent more often than if he continues to reside with her.
David argues that he can provide a loving home with easy access to his parents who live ten minutes away. He also argues that Alex will not have to spend as much time in daycare because Edna Murphy's mother will be babysitting her grandson and Alex while David is at work. Lastly, he argues that although he was not the primary care giver he did spend considerable time with his son.
While a trial court's discretion in a custody proceeding is broad, it is not absolute, and must be guided by the language set forth in R.C.3109.04. Baxter v. Baxter (1971), 27 Ohio St.2d 168. In addition, the trial court's determination in a custody proceeding is, of course, subject to reversal upon a showing of an abuse of discretion. Trickeyv. Trickey (1952), 158 Ohio St. 9. The discretion which the trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. Miller v. Miller
(1988), 37 Ohio St.3d 71. The term "abuse of discretion" connotes more than an error of law or judgment, it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219. Decisions are unreasonable if they are unsupported by a sound reasoning process. AAAA Enterprises, Inc. v. RiverPlace Community Urban Redevelopment Corp. (1990), 50 Ohio St.3d 157,161.
In the area of child custody, commentators have long urged adoption of a primary caretaker standard and an increasing number of states have incorporated this concept into their custody law.
In 1982, this court held that in determining the best interests of a child in an original award of custody, the trial court, in addition to those factors set forth in R.C. 3109.04, should strongly consider which parent was the primary caretaker of the child. In re Maxwell (1982),8 Ohio App.3d 302. We held that a court that fails to consider the primary care giving of a parent ignores the benefits likely to flow to the child from maintaining day to day contact with the parent on whom the child has depended for satisfying his basic physical and psychological needs.
In Maxwell, we cited at length from the well-reasoned opinion of Justice Richard Neely in Garsha v. McCoy (W.Va. 1981), 278 N.E.2d 357 wherein the West Virginia Supreme Court held that with reference to very young children, the law presumes that it is in the best interests of such children to be placed in the custody of the primary caretaker if he or she is fit.
In determining who is the primary caretaker parent, Justice Neely wrote:
 "While it is difficult to enumerate all of the factors which will contribute to a conclusion that one or the other parent was the primary caretaker parent, nonetheless, there are certain obvious criteria to which a court must initially look. In establishing which natural or adoptive parent is the primary caretaker, the trial court shall determine which parent has taken primary responsibility for, inter alia, the performance of the following caring and nurturing duties of a parent: (1) preparing and planning of meals; (2) bathing, grooming and dressing; (3) purchasing, cleaning, and care of clothes; (4) medical care, including nursing and trips to physicians; (5) arranging for social interaction among peers after school, i.e. transporting to friends' houses or, for example, to girl or boy scout meetings; (6) arranging alternative care, i.e. babysitting, day-care, etc., (7) putting child to bed at night, attending to child in the middle of the night, waking child in the morning; (8) disciplining, i.e. teaching general manners and toilet training; (9) educating, i.e. religious, cultural, social, etc.; and, (10) teaching elementary skills, i.e., reading, writing and arithmetic.
8 Ohio App.3d at 305.
Minnesota was one of the first states to adopt the "primary caretaker" doctrine.
In Berndt v. Berndt (Minn. 1980), 292 N.W.2d 1, the Minnesota Supreme Court held that their statutory criteria mandate that, when the evidence indicates that both parents would be suitable custodians, the intimacy of the relationship between the primary parent and the child should not be disrupted "without strong reasons which relate specifically to the [primary] parent's capacity to provide and care for the child." In Pikulav. Pikula (Minn. 1985), 374 N.W.2d 705, the Minnesota Supreme Court stated the importance of emotional and psychological stability to the child's sense of security, happiness, and adaption that it deemed dispositive in Berndt is a postulate embedded in its statutory factors and about which there is little disagreement within the profession of child psychology. Id. at 711.
Some state courts take the view that a presumption exists in favor of the primary caretaker parent and some have held like we have that it is but a factor entitled to important consideration in awarding custody.See Annotation, Primary Caretaker Role of Respective Parents as a Factorin Awarding Custody of Child, 41 A.L.R. 4th, 1129, 1134. All of these courts have noted that primary care taking is a significant factor when the children being cared for are of tender years.
In Bechtol v. Bechtol (1990), 49 Ohio St.3d 1, the Ohio Supreme Court again reiterated that an award of custody supported by a substantial amount of credible and competent evidence should not be reversed as being against the manifest weight of the evidence. In Bechtol, the supreme court held that there was present in the record competent and credible evidence to support the trial court's award of custody of the parties' six year old boy to the father, Joseph Bechtol.
Testimony at the trial revealed that Nancy Bechtol was the child's primary care giver, but that Joseph had spent a great deal of time with his son after the marriage broke up. A court appointed psychologist testified that both parents were capable but he expressed a narrow preference for the father. The court of appeals reversed finding that the trial court abused its discretion in granting custody to Joseph because it failed to accord appropriate weight to the mother's role as primary care giver.
In reversing the court of appeals, Justice Wright wrote the following:
 The court of appeals properly noted that in Ohio a trial court in forming a custody order should give due consideration to which parent performed the role as primary care giver. However, the error here is the court of appeals' finding that the trial court did not properly consider this factor. In its findings of fact the trial court specifically noted that "* * * the Plaintiff [Nancy Bechtol] provided services as a homemaker and child caretaker [care giver] during the marriage. * * *" The trial court also noted that Nancy Bechtol did not work outside the home during the marriage and only recently had become employed.
 The court of appeals found that it would be "* * * ill advised and imprudent to disrupt the pattern to which the child has become accustomed." Even assuming this to be the case, this conclusion falls short of the oft-repeated test that a finding of abuse of discretion must imply a decision that is "`* * * unreasonable, arbitrary or unconscionable.'" Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142. See, also, Trickey v. Trickey (1952), 158 Ohio St. 9, 13-14, 47 O.O. 481, 483, 106 N.E.2d 772, 774.
The trial court stated it had considered the relevant factors in R.C. 3104.04(F)(1). Both parents wished custody of Alex. The child interacted well with both his parents and his grandparents. Alex was well adjusted to his environment with his mother although he experienced some difficulty with kindergarten.
Both parents were physically and mentally healthy and both appeared capable of honoring the visitation privileges of the other. Both parents worked long hours. If Alex were placed with David he would be required to rise very early in the morning but would have David's girlfriend available to meet him upon returning home from school. There was evidence that Kelly's hours had been substantially reduced in recent months.
Although the magistrate noted he had considered that Kelly had been Alex's primary care provider since his birth, the trial court made no mention of this important consideration. In Bechtol, the Ohio Supreme Court was reluctant to find that the trial court had abused its discretion in awarding a six year old to the father despite evidence that the mother was the primary care giver. In that case, however, the supreme court noted that the trial court had properly considered that factor before making its award of custody. Accordingly, the appellant's assignment of error is Sustained in part, and this matter will be remanded to the trial court to make its decision about the award of custody after giving due consideration to the primary care giver factor.
The judgment of the trial court is Reversed and Remanded for further proceedings.
WOLFF, P.J., and FAIN, J., concur.
Court of Appeals of Ohio, Second District, Montgomery County.